Robert W. Norman (SBN 025328)
bnorman@houser-law.com
Regina Liou (SBN 023334)
rliou@houser-law.com
HOUSER & ALLISON
A Professional Corporation
14362 N. Frank Lloyd Wright Blvd., Suite 2127
Scottsdale, Arizona 85260
Telephone: (480) 428-8370
Facsimile: (480) 428-8371

Attorneys for Defendants Ocwen Loan Servicing, LLC and Litton Loan Servicing, LP
(erroneously named as Litton Loan Servicing, LLC.)

## UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF ARIZONA – PHOENIX DIVISION

| | |
|---|---|
| James Kramer,<br><br>             Plaintiff,<br><br>vs.<br><br>Ocwen Loan Servicing, LLC; Unknown<br>Thurd Party Defendants 1-100; Unknown<br>Other Defendants 1-100; Litton Loan<br>Servicing, LLC.,<br><br>             Defendants. | Case No.<br><br>Hon:<br><br>[Removal from Superior Court of Arizona,<br>County of Maricopa, CV2013-008640]<br><br>**DEFENDANTS' NOTICE OF<br>REMOVAL OF ACTION TO<br>FEDERAL COURT BASED UPON<br>DIVERSITY JURISDICTION**<br><br>**[28 U.S.C. § 1441 (b)]** |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

      **PLEASE TAKE NOTICE** that Defendants Ocwen Loan Servicing, LLC and

Litton Loan Servicing, LP ("Defendants") hereby remove to this Court the above-

captioned action described further below:

/ / /

/ / /

---

1.     On June 25, 2013, Plaintiff James Kramer ("Plaintiff") served a Complaint on Defendants Ocwen and Litton.  This case is entitled James Kramer v. Ocwen Loan Servicing, LLC, et al., as case number CV2013-008640.  The original complaint was filed in the Superior Court of Arizona, County of Maricopa on June 24, 2013.  A true and correct copy of the relevant documents and pleadings in Defendants' possession are attached hereto as Exhibit A.

2.     Defendants remove this case within 30 days of service and within one year from filing of the Complaint.

3.     No previous request has been made for the relief requested.

4.     The Superior Court of Arizona, County of Maricopa is located within the District of Arizona.  See 28 U.S.C. § 82.  Thus, venue is proper in this Court because it is the "district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).

5.     This action is removable to the instant Court because it originally could have been filed in this Court pursuant to 28 U.S.C. § 1441(b).  There is diversity jurisdiction.  Supplemental jurisdiction exists with respect to any remaining claims pursuant to 28 U.S.C. § 1367.

## DIVERSITY OF CITIZENSHIP

6.     Plaintiff alleges that he is a resident of Maricopa County, Arizona.  (Complaint ¶ 1).  Upon information and belief, Plaintiff is a citizen of Arizona.

7.     Defendant Ocwen is a Delaware limited liability company and its sole member is Ocwen Financial Corporation.  Ocwen Financial Corporation is a Florida corporation with its principal place of business in Georgia.  For the purposes of diversity, a limited liability company takes the citizenship of each of its members and a corporation's citizenship is comprised of both its state of incorporation and the state where it has its principal place of business.  28 U.S.C. § 1332(c).  At the present time and at the time of commencement of this action, Ocwen Loan Servicing, LLC is a

/ / /

citizen of Florida and Georgia.  A true and correct copy of the Arizona Secretary of State web-site printout for Ocwen is attached as Exhibit B.

8.    Defendant Litton is a limited partnership whose general partner is Ocwen Capital Management, LLC and whose limited partner is Ocwen Loan Servicing, LLC. Ocwen Capital Management, LLC is a Delaware limited liability company with its principal place of business in Florida.  Ocwen Capital Management, LLC is a wholly-owned subsidiary of Ocwen Financial Corporation.  Ocwen Loan Servicing, LLC is a Delaware limited liability company and its sole member is Ocwen Financial Corporation.  Ocwen Financial Corporation is a Florida corporation with its principal place of business in Georgia.  For the purposes of diversity, a limited partnership's citizenship is comprised of the citizenship of the partnership's limited and general partners.  *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015 (1990).  At the present time and at the time of commencement of this action, Litton Loan Servicing, LP is a citizen of Delaware, Florida, and Georgia.  A true and correct copy of the Arizona Secretary of State web-site printout for Litton is attached as Exhibit C.

9.    The Complaint alleges damages as a result of Defendants' actions to non-judicially foreclose on the property.  As set forth by Plaintiff's allegations, the amount of the loan and/or value of the property are in excess of $75,000.00.

10.    Plaintiff obtained a first loan in the original principal amount of $352,000.00.  The current principal amount is $347,754.55.  Plaintiff alleges that he sought loss mitigation in a short sale in the amount of $233,000, while the Defendants approved of loss mitigation for a short sale in amounts of $250,000.00, $255,000.00, and $260,000.00.  (Complaint ¶¶ 20-23).  The difference between the current principal amount and the valuations by Plaintiff and by Defendants exceed the sum of $75,000.00.

/ / /

/ / /

/ / /

/ / /

11. Accordingly, there is complete diversity of citizenship, and the amount in controversy in this action likely exceeds the sum of $75,000.00, exclusive of interest, and costs. Diversity jurisdiction exists and this action is removed to this Court pursuant to 28 U.S.C. § 1441(b).

Dated: July 15, 2013                    **HOUSER & ALLISON, APC**

                                   s/ Regina Liou
                                   Robert W. Norman
                                   Regina Liou
                                   Attorneys for Defendants Ocwen Loan
                                   Servicing, LLC and Litton Loan Servicing, LP

*Original filed electronically
with the Clerk's Office this same date
and with COPIES to be delivered via
U.S. Mail to the following:*

David W. Dow, Esq.
The Law Offices of David W. Dow
3104 E. Camelback Rd., #281
Phoenix, AZ 85016
*Attorney for Plaintiff*

s/ Courtney Hershey
Courtney Hershey

---

1   David W. Dow, Esq. (SBN 007377)
    **THE LAW OFFICES OF DAVID W. DOW**
2   3104 E. Camelback Road #281
    Phoenix, AZ 85016
3   Phone: 602-550-2951
    Fax: 480-945-0553
4   ddowlaw1@gmail.com
5   *Attorney for Plaintiff*

6

7                 **ARIZONA SUPERIOR COURT**

8                   **COUNTY OF MARICOPA**

                                CV2013-008640

9   JAMES KRAMER,           )   Case No.:
10                      )
11            Plaintiff,     )         **SUMMONS**
                     )
12   v.                   )
                     )
13                      )
    OCWEN LOAN SERVICING, LLC;  )
14   UNKNOWN THURD PARTY     )
    DEFENDANTS 1-100; UNKNOWN  )   If you would like legal advice from a lawyer,
15   OTHER DEFENDANTS 1-100; LITTON )   contact the Lawyer Referral Service at
    LOAN SERVICING, LLC.      )           602-257-4434
16                      )               or
                     )     www.maricopalawyers.org
17                      )       Sponsored by the
        Defendants.      )   Maricopa County Bar Association
18                      )

19   ────────────────────────────

20   | WARNING: This is an official document from the court that affects your rights.  Read this carefully. |
    **If you do not understand it, contact a lawyer for help.**

21

22   **FROM THE STATE OF ARIZONA TO:** <u>**LITTON LOAN SERVICING, LLC**</u>
23                       Name of Respondent

24               Corporation Service Company
25              2338 W. Royal Palm Rd. Ste J
                Phoenix, AZ 85021

26

27   **SIGNED AND SEALED this date**

────────────────────────────

The Law Offices of David W. Dow



COPY

1

MICHAEL JEANES, CLERK OF COURT

JUN 2 4 2013

2

MICHAEL K. JEANES, CLERK
M. GARCIA

By_____

DEPUTY CLERK

3

Deputy Clerk

4

If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court, and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to the Office of the Clerk of the Superior Court, 201 West Jefferson Street, Phoenix, Arizona 85003-2205 or Office of the Clerk of the Superior Court, 18380 North 40th Street, Phoenix, Arizona 85032 OR Office of the Clerk of Superior Court, 222 East Javelina Drive, Mesa, Arizona 85210-6201 or

5

6

7

8

Office of the Clerk of Superior Court, 14264 West Tierra Buena Lane, Surprise, Arizona, 85374. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons.

9

10

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

11

2. If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court, and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to the Office of the Clerk of the Superior Court, 201 West Jefferson Street, Phoenix, Arizona 85003-2205 or Office of the Clerk of the Superior Court, 18380 North 40th Street, Phoenix, Arizona 85032 OR Office of the Clerk of Superior Court, 222 East Javelina Drive, Mesa, Arizona 85210-6201 or

12

13

14

Office of the Clerk of Superior Court, 14264 West Tierra Buena Lane, Surprise, Arizona, 85374. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons.

15

16

3. If this *"Summons"* and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your *"Response"* or *"Answer"* must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served. If this *"Summons"* and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

17

18

19

20

4. You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court's Customer Service Center at 601 West Jackson, Phoenix, Arizona 85003 or at 222 East Javelina Drive, Mesa, Arizona 85210.

21

22

5 If this is an action for dissolution (divorce), legal separation or annulment, either or both spouses may file a *Petition for Conciliation* for the purpose of determining whether there is any mutual interest in preserving the marriage or for Mediation to attempt to settle disputes concerning custody and parenting time issues regarding minor children.

23

24

6. Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) days before your scheduled court date.

25

26

27

The Law Offices of David W. Dow

Page 2 of 2

EXHIBIT A    Page 2 of 2
PAGE 2 OF 76

David W. Dow, Esq. (SBN 007377)
THE LAW OFFICES OF DAVID W.
DOW
3104 E. Camelback Road #281
Phoenix, AZ 85016
Phone: 602-550-2951
Fax: 480-945-0553
ddowlaw1@gmail.com
*Attorney for Plaintiff*

**COPY**

JUN 2 4 2013

MICHAEL K. JEANES, CLERK
M. GARCIA
DEPUTY CLERK

# SUPERIOR COURT OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

JAMES KRAMER,

                    Plaintiff,

v.

OCWEN LOAN SERVICING, LLC;
UNKNOWN THURD PARTY
DEFENDANTS 1-100; UNKNOWN OTHER
DEFENDANTS 1-100; LITTON LOAN
SERVICING, LLC.

                    Defendants.

Case No. CV2013-008640

**COMPLAINT**

1.      Plaintiff is a citizen and resident of Maricopa County Arizona, residing at 2678 N

133rd Drive, Phoenix Arizona 85395.

2.      Defendant Ocwen Loan Servicing LLC (Ocwen) is a foreign business entity,

domiciled in Delaware, doing business in Arizona, whose agent for service of process is

Corporation Service Company, 2338 W. Royal Palm Rd Suite J, Phoenix AZ, 85021, and is

1

EXHIBIT A
PAGE 3 OF 76

1

2   successor in interest to ResCap Parties, and Ally/GMAC by virtue of a purchase in Bankruptcy

3   of the assets and corresponding loan servicing duties of said predecessors.   Defendant Ocwen,

4   and the Unknown Third Party Provider Defendants are all subject to a Consent Judgment

5   entered in the United States District Court for the District of Columbia on April 4, 2012 in

6

7   United States et al. v. Bank of America et al. Case 1:12-cv-00361 (2012 USDOJ CJ).  A copy of

8   the 2012 USDOJ CJ is attached hereto and incorporated by reference as Exhibit A.

9

10          3.     Litton Loan Servicing LP (Litton) is a foreign limited partnership registered with

11   the Arizona Secretary of State, and whose agent for service of process is Corporation Service

12   Company, 2338 West Royal Palm Rd, Suite J Phoenix Arizona 85021.

13

14          4.     Unknown Third Party Provider Defendants are those providers of loss mitigation

15   and foreclosure services employed by other Defendants to assist and further the illegal conduct

16   set out herein, including, but not limited to lawyers, foreclosure process trustees, and other

17   facilitators of the illegal conduct described herein.

18

19          5.     Unknown Other Defendants are other business entities who participated in, or

20   were aware of the illegal conduct described herein, and could have prevented it but did not, and

21   profited by the illegal conduct described herein.

22

23          6.   In addition to the payment of many billions of dollars, the 2012USDOJ CJ requires

24   that Defendants perform numerous conduct remedies intended to halt the illegal acts and

25   practices they had been engaged in, relating to loss mitigation, for some years. This conduct

26   remedies are set out in the "Settlement Term Sheet", attached hereto and incorporated by

27

28   reference as EXHIBIT B (Exhibit A to the 2012 USDOJ CJ)

EXHIBIT A
PAGE 4 OF 76

7.  At all times relevant hereto, Defendants refused and failed to provide the promised conduct

remedies set out in Exhibit B, which illegal acts caused or materially contributed to Plaintiff's damages set out herein. A few of the many willful violations of specific requirements which caused or contributed to Plaintiff's damages are set out below. The indexing below conforms to the indexing in Exhibit B, in order to assist in cross reference to the Exhibit;

### Settlement Term Sheet

### 1. FORECLOSURE AND BANKRUPTCY INFORMATION AND DOCUMENTATION

#### A. Standards for Documents Used in Foreclosure and Bankruptcy Proceedings

1.  Servicer shall ensure that facts asserted in non-judicial foreclosure are accurate and complete and supported by competent and reliable evidence.

2.  Servicer shall ensure that affidavits, sworn statements and declarations (ASSDEC) are based on personal knowledge.

3.  Servicer shall ensure that ASSDEC are based on facts which "would be admissible in court".

4.  Servicer shall have standards for employee qualifications, training, and supervision, shall oversee the training, and maintain records confirming that each such employee has completed the required training.

5.  Servicer shall review and approve forms of ASSDEC to ensure compliance with applicable law, rules, and the terms of this Agreement.

6.  ASSDEC shall include the name of the affiant, title, and entity they work for.

7.   Notary shall comply with state law required.

8.  ASSDEC shall not contain information that is false or unsubstantiated.

9.  Servicer shall ensure that it has adequate number of employees, and employees have reasonable time to prepare documents.

10.  Servicer shall not use incentives to encourage undue haste or lack of due diligence.

11.  ASSDEC shall be hand signed (except for electronic filing) and affiant shall be a person.

12.  At time of signing, all information required by a form ASSDEC must be complete.

13.  Affiants shall date signatures on ASSDEC.

EXHIBIT A
PAGE 5 OF 76

14.    Servicer shall maintain records of Servicer documents executed by employed notary.

18.    In all states Servicer shall send borrower a statement setting forth facts supporting the right to foreclose and containing the information required (items available, account statement, ownership statement. loss mitigation statement etc.). Servicer shall send the statement no later than 14 days prior to referral to foreclosure attorney or foreclosure trustee.

**B. Requirements for Accuracy and Verification of Borrowers' Account Information.**

1.    Servicer shall maintain procedures to ensure accurate and timely updating of borrower's account information.

2.    Servicer shall promptly accept all borrower payments ... Servicer shall ensure that properly identified payments shall be posted .... and credited as of the date received.

5.    Servicer shall provide to borrowers adequate information on monthly billing or other account statements ... in clear and conspicuous language (account data).

6.    In statements described (above) ... (c) If Servicer has commenced foreclosure ... copies of any assignments of mortgage, or deed of trust required to demonstrate the right to foreclose ... and (d) The name of the investor that holds the borrowers loan.

**C.    Documentation of Note, Holder Status and Chain of Assignment.**

1.    Servicer shall implement a process to ensure foreclosing entity has a documented enforceable interest under applicable state law.

5.    Servicer shall not dispose of original notes

6.    Servicer shall ensure that mortgage assignments have legal authority, reflect the completed transaction, and are properly acknowledged.

## II. THIRD PARTY PROVIDER OVERSIGHT

**A. Oversight Duties Applicable to All Third Party Providers (Lawyers, foreclosure firms)**

1.    Servicer shall perform due diligence as to qualifications, experience, reputation, complaints, document practices, reputation etc.

2.    Servicer shall require them to comply with state and federal laws and rules.

3.    Servicer shall ensure [they] provide for adequate oversight.

5.    Servicer shall ensure that all information provided [to them] is accurate and complete.

6.    Servicer shall conduct reviews [of them] to include [see text -basically everything required in the entire settlement].

EXHIBIT A
PAGE 6 OF 76

7.      Servicer shall take remedial steps if problems identified [including termination].

9.      Servicer shall regularly review and assess the adequacy of its internal controls with respect to its obligations and take appropriate remedial steps including appropriate remediation in individual cases.

**B. Additional Oversight of Activities by Third Party Providers.**

1.      Servicer shall require a certification process for law firms as qualified [including competence and experience].

2.      Servicer shall ensure that attorneys are [licensed. competent and comply with law].

3.      Servicer shall ensure/have appropriate Servicer contact to assist in legal proceedings and to facilitate loss mitigation questions on behalf of the borrower.


# IV. LOSS MITIGATION

A.      Loss Mitigation Requirements.

I.      Servicer shall be required to notify potentially eligible borrowers of available loss mitigation options prior to foreclosure referral.

2.      Servicer shall offer and facilitate loan modification rather than initiate foreclosures when such loan modifications are Net Value Positive and meet other requirements.

B.      Dual Track Restricted. (Forbids foreclosure acts while loan modification efforts are being pursued.)

C.      Single Point of Contact (SPOC). (Requires a SPOC and that borrowers have access to an employee of Servicer to obtain information throughout the loss mitigation, loan modification and foreclosure process.)

D.      Loss Mitigation Communication with Borrowers. (Requires specific outreach efforts and sets time deadlines and duties of Servicer.)

E.      Development of Loan Portals. (Requires servicer to develop or contract for an online portal linked to Servicer's system where borrowers can check, at no cost the status of their first lien loan modification.)

F.      Loan Modification Timelines. (Sets a 3 day deadline for acknowledgment of document receipt 5 day advising of defects, 30 days for correction etc.)

G.      Independent Evaluation of Denials (Includes modification evaluation by a neutral. with notice, and an appeal process.)

H.      General Loss Mitigation Requirements. (Includes ten paragraphs of requirements as to staffing levels and qualifications, forbids compensation which encourages foreclosure, forbids recommending non-payment to qualify for loss mitigation relief, sets timelines for actions, generally controls all aspects of loss mitigation processes.)

EXHIBIT A
PAGE 7 OF 76

I.        Proprietary First Lien Loan Modifications (Requires loan modification programs "that are intended to produce sustainable modifications within guidelines and previous results.)

1.        Proprietary Second Lien Modifications. (Requires servicer design loan modification programs with intent of providing payments for borrowers needing longer term or permanent assistance.)

K.        Short Sales.(Includes seven paragraphs controlling all aspects of short sale loss mitigation, sets time lines, requires servicers "develop a cooperative short sale process".)

8.        The 2012 USDOJ CJ explicitly provides for victims compensation remedies for any breach of any of the terms of the Consent Judgment in Exhibit E "Enforcement Terms" Paragraph (J) (3). **Enforcement Action.** "Nothing in this Section shall limit the availability of remedial compensation to harmed borrowers as provided in Section E. 5 " [which requires the Bank as a loan servicer to "remediate any material harm to particular borrowers identified] (Emphasis in original).

9.        All Defendants are jointly and severably liable for damages to Plaintiffs pursuant to the terms of the 2012 USDOJ CJ, as described above, and Arizona statute and common law. Additionally, the requirements set out in the 2012 USDOJ CJ are binding on Defendants as industry standards in loss mitigation in loan servicing, and pursuant to directives of the United States Office of the Comptroller of the Currency, the Federal Reserve Board and other regulatory agencies.

10.        Had the conduct remedies promised in the 2012 USDOJ CJ been kept, the illegal misconduct described herein would not have occurred, and the Plaintiffs' injury and damages described herein would have been avoided.

6

11.     Defendants had no good faith intent to provide the conduct remedies in the 2012 USDOJ CJ when they executed it, seemingly has none at present, and has failed to provide such conduct remedies to Plaintiff or Arizona consumer victims generally. In fact, the most recent report of the Monitor of the 2012 USDOJ CJ documents severe systemic failures. including some of those same failures described herein.

12.     July 11, 2005, Plaintiff purchased from Unknown Defendants financial services in the form of an inappropriate subprime mortgage, an interest only variable rate first and second lien mortgage loan, which said Unknown Defendants knew was unattainable, was designed to fail, and which did fail.  Said Unknown Defendants committed misrepresentations, and concealed material facts in commercial communications before and during the purchase transactions, in violation of Arizona statutes and common law, as described herein.

13.     In March 2009, Defendant Litton Loan Servicing LP contacted Plaintiff and solicited him to engage in a loan modification consisting of another subprime mortgage interest only loan with a new expiration in 2013, which Defendant Litton knew was unattainable, was designed to fail, and which did fail, and during which Defendant Litton committed misrepresentations and concealed material facts, including that the loan modification included relinquishing rights as to illegal acts by Defendants. In addition, Litton Loan provided an incentive to the Plaintiff to accept the loan modification in a time frame that did not allow him to have the documents reviewed by legal counsel for his own protection, but demanded that the loan modification docs be signed as is and returned within a 5 day time frame or lose the modification.

EXHIBIT A
PAGE 9 OF 76

14.    In March 2009, the first lien mortgage servicing was transferred to Defendant Ocwen, without notice to Plaintiff.

15.    In December, 2011, responding to commercial communications by Defendants touting their loss mitigation and loan modification programs, Plaintiff visited the website of Defendant Ocwen offering loan modification terms and the promise of a return call within 48 hours of completing the online application and a timely response within 30 days of a complete package. Plaintiff called into the loan modification department and confirmed that his documents were complete. Plaintiff was not updated on the status of the application and was not provided any written communication regarding the status of his documents or application until he received a phone call declining his application for modification due to the lender stating that they did not believe that he only took home $3500 from his business, that his business had sufficient funds in it to pay the debt . Plaintiff repeatedly both verbally and in writing attempted to explain to the Defendant's representative that he could not drain his business each month as he had to pay invoices, contract labor and normal business expenses from the business funds that were always in place to keep his business running. Plaintiff refused any attempt at explanation or documentation even though Plaintiff provided proof thru personal bank statements that the only personal income he received to pay bills monthly was $3500 per month. Plaintiff was given no assistance in  preparing documents that would support the required income explanation in a way that lender would accept, was never offered counsel as required by a SPOC, but was declined for the modification. Plaintiff was rejected, with no written documentation, but was informally told that the reason was that he "didn't need it"

EXHIBIT A
PAGE 10 OF 76

based on Defendant Ocwen refusing to consider income data it had been provided and accusing the Plaintiff of falsely representing the income.

16.     On June 12, 2012 Plaintiff again applied to Defendant Ocwen for a loan modification which was again refused without written documentation required by the 2012 USDOJ CJ, was not informed of other loss mitigation options as required by the 2012 USDOJ CJ, was not provided a SPOC, or given any of the conduct remedies required in the 2012 USDOJ CJ. nd was advised to miss payments, in violation of the 2012 USDOJ CJ.

17.     When Plaintiff missed payments he was served with foreclosure notices without any options to foreclosure provided, in violation of the 2012 USDOJ CJ

18.     Plaintiff employe a real estate sales agent, and put the house on the market, disclosing, as legally required, that there was severe structural damage and settling due to subsurface weakness.  Defendant Ocwen was made aware of the structural defects in the property.

19.     Between April 10 – 29, 2013 Plaintiff, by his realtor, sought loss mitigation in a short sale, and provided all required documents to Defendant Ocwen.  In violation of the 2012 USDOJ CJ, Defendant Ocwen failed to provide required written documentation, failed to provide a SPOC, or portal, or any other conduct remedies described in the section of Exhibit B relating to short sales.  Plaintiff by his realtor found a buyer at fair market value, considering the structural damage to the home, and advised Defendants of the offer19.  On May 1, 2013, Defendant Ocwen, in violation of contract refused to honor terms relating to the close of escrow date, and refused to permit the sale at fair market value, simply saying that the offer "was not sufficient", without providing a basis for the refusal. At no time was the Plaintiff

9

provided any written explanation of the decision or explanation as to why the Plaintiff refused

to accept the true present market value of the property in it's present condition.  Any premium

demanded above fair market value extorts money from victims in that they are required to pay

money to protect their reputation and credit history from a foreclosure at which they would be

exempt from liability under the Arizona anti-deficiency statute.

20.   On or around May 15, 2013, in pursuit of establishing the fair market value on

the property Defendant hired an outside third party to perform what is known as a Broker's

Price Opinion (BPO).  Defendant sets the parameters, instructions and guidelines  for these

price opinions to be performed.   Lender is not providing contracted services with instructions

on valuing the property that can produce a fair market value, rather they are instructing the

servicer to willfully neglect the conditions that impact the property value which is an action that

harms the sellers ability to market the property and complete a short sale successfully. This

represents a willfull neglect of material facts that have created harm to the consumer.

On May 15, 2013, Defendant Ocwen, ( as a result of the BPO performed on the property )

demanded "between $250000 and 255,000" knowing that the fair market value was thousands

of dollars less, in violation of the 2012 USDOJ, Arizona statutes and common law described

herein.  Plaintiff requested an onsite structural interior inspection as to the structural failure,

however the inspecting agent, an Unknown Third Party Provider Defendant, told

Plaintiff( through his agent),  that he "was not interested" in the structural failures, even though

he was told that cosmetic repairs would not suffice, and refused to do a structural evaluation, all

in violation of the 2012 USDOJ CJ, Arizona statute and common law described herein.  None

10

of the USDOJ CJ conduct remedies set out in the short sale requirements was ever provided and none of the required documentation was provided.

21.    Defendants failed to contact the Plaintiff in writing as required, and on May 22, 2013, Plaintiff, by his agent was advised that the demanded amount was still far above fair market value, "$250,000 to 255,000" with no adjustment for the structural defects in the property.  None of the requirements of the 2012 USDOJ CJ, Arizona statutes and common law described herein were met.

22.    On May 22, 1013 Plaintiff, by his agent negotiated a higher offer at $233,000, the last and best offer possible.  Defendant Ocwen refuses to consider the offer. Plaintiff, by his agent contacted both Ocwen and Federal National Mortgage association to provide documentation and photos and requested a formal value dispute but instead of taking damage into consideration the Plaintiff was told that the counter offer had now increased to $260,000 .  No written explanation or explanation of the new increase in the offer was ever provided to the Plaintiff.  None of the requirements of the 2012 USDOJ CJ, Arizona statute and common law described herein were provided.

23.    On June 10, 2013 Plaintiff, by agent contacted Defendant Ocwen and was advised that the requirement for a short sale was now $260,000, far above fair market value, and a larger demand than a few weeks before, without any response to the requested value dispute, written documentation to indicate where the new valuation came from or acknowledgement of the Plaintiffs request for new material facts that had been presented to be considered.  in violation of the 2012 USDOJ CJ, Arizona statute and common law described herein.

EXHIBIT A
PAGE 13 OF 76

24.     On June 12, 2013, Plaintiff, again by agent contacted Defendant Ocwen requesting a value dispute, which Defendant Ocwen refused to even consider, informed the Plaintiff by his agent, that the file had been closed and the property would be foreclosed without any further consideration or explanation, in violation of the 2012 USDOJ CJ, Arizona statute and common law described herein, forcing an unnecessary foreclosure.

25.     The short sale loss mitigation program offered was at all times controlled by the terms of the 2012 USDOJ CJ, Arizona statutes and common law, as described herein.

26.     Defendants and Unknown Defendants have continuously violated the 2012 USDOJ CJ. and Arizona statute and common law relating to loss mitigation by repeatedly refusing and failing to provide the required information and documentation described in Exhibit B, failure to provide third party oversight as described in Exhibit B, and failure to provide the loss mitigation requirements set out in Exhibit B.

27.     A.R.S. 44-1522 (A) provides that "The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false promise, misrepresentation, or concealment, suppression or omission, of any material fact with intent that others rely upon such ... is declared to be an unlawful practice." The term "deceptive" has been interpreted in Madsen v. Western American Mortgage Co. 143 Ariz. 614,694 P. 2d 1228 (App 1985) and Ward v. Fireman's Fund Insurance Companies 152 Ariz. 211, 731 P.2d 106 (App 1986) to include representations that have a "tendency and capacity" to convey misleading impressions to consumers even though interpretations that would not be misleading are also possible. *Chrysler Corp.* v. *F. T.* C, 561 F2d 357,363, (D.C.Cir 1977); *Goodman v. FTC* 244 F. 2d 584 (9th Cir.

EXHIBIT A
PAGE 14 OF 76

1957), *reaffirmed in Simeon Management COJP* v. *FTC*, 579 F.2d 1137 (9th Cir. 1978). The meaning and impression are to be taken from all that is reasonably implied, not just from what was said, *Spiegel, Inc.* v. *FTC -/11 F.2d -/81 (7/[11] Cir 1969), and in evaluating the representations. the test is whether the least sophisticated reader would be misled.* Exposition Press, Inc. v. FTC. 295 F.2d 869 *(2d Cir. 1961, cert denied 370 Us.* 917 (1962). *Technical correctness of the representation is irrelevant if the capacity to mislead is found.* See Chrysler Corp. supra. Additionally, a deceptive representation or practice may be found where earlier misrepresentations are corrected before the consumer agrees to a contract *Exposition Press supra..*

28.     Despite Plaintiffs efforts at pursuing his rights under Arizona law and the 2012 USDOJ CJ, Defendants now threaten to foreclose on Plaintiffs home, in violation of 2012 USDOJ CJ, Arizona statutes and common law.. '

## COUNT ONE -VIOLATION OF A.R.S. 44-1522 BY CONDUCT

29.   All of the allegations set out above are reasserted and incorporated by reference.

30.   The false and deceptive acts and practices described above were in violation of A.R.S. 441522. The illegal conduct in violation of the 2012 Consent Judgment constitute additional and separate violations of A.R.S. 44-1521 et seq.

31.   Plaintiff was damaged by the violations of law set out above. in an amount to be proven at trial, but which exceeds the jurisdictional minimum of the Court.

## COUNT TWO -VIOLATION OF A.R.S. 44-1522 BY CONCEALMENT OR OMISSION

32.   All of the allegations set out above are reasserted and incorporated by reference.

EXHIBIT A
PAGE 15 OF 76

33.    At all times material hereto, Defendants have issued repeated commercial communication by advertisement, press release, online media. and otherwise, representing that they would abide in good faith with all of the promised conduct relief described and set out in such repeated commercial communications, but concealing or suppressing the material facts that Defendants had never kept such promises. have failed to abide by the 2012 USDOJ CJ, and had no intent to do so, and by concealing the fact that Plaintiffs would never qualify for a loan modification, thereby inducing Plaintiffs to engage in a sham process, during which Defendants would collect or bill illegal and unnecessary service fees, and otherwise damage Plaintiffs as described herein.

34.    Plaintiff was damaged by the illegal acts described above. caused damage to his reputation and credit rating, and otherwise injured, in an amount to be proven at trial which exceeds the jurisdictional minimum of the Court.

## COUNT THREE -BREACH OF CONTRACT

35.    All of the allegations set out above are reasserted and incorporated by reference.

36.    The documents developed by the parties in the origination of the loan and mortgage which are the subject of this litigation were incorporated into a mortgage note, a deed of trust and other contract documents, and include promises as to loss mitigation, loan modification, payment collection, and foreclosure and adherence to applicable law. which all parties understood to be subject to modification as required by economic circumstances. By the acts and practices described above, Defendants breached these contract promises.

37.    Plaintiffs were damaged by the illegal acts described above in an amount to be proven at trial which exceeds the jurisdictional minimum of the Court.

## COUNT FOUR -VIOLATION OF AR.S. TITLE 33 CHAPTER 6.1

38.    All of the allegations set out above are reasserted and incorporated by reference.

39.    AR.S. Title 33 Chapter 6.1 provides for specific requirements as to notice and procedure for loss mitigation and foreclosure which Defendants failed to obey as described above. Additionally. the violations of the 2012 Consent Judgment set out above were in violation of AR.S. Title 33 Chapter 6.1 The Arizona Supreme Court in Patton v. First Federal Savings and Loan Ass'n 118 Ariz. 473, 578 P.2d 152 (1978) required that Defendants must strictly comply with all legal requirements, and that all applicable statutes be strictly construed in favor of Plaintiffs. The Arizona Supreme Court in In re Krohn v. Sweetheart Properties, LTD and Citimortage 203 Ariz. 205, 52 P3d 774 *(2001)* held that Banks are required to provide a foreclosure process which provides Plaintiffs with "not just procedural, but [also] fundamental fairness." (at 779). Defendants herein failed to do so, in violation of Arizona statute and common law.

40.    Plaintiffs were damaged by the illegal acts described above in an amount to be proven at trial which exceeds the jurisdictional minimum of the Court.

## COUNT FIVE-TORTUOUS NEGLIGENT MISREPRESENTATION

41.    All of the allegations set out above are reasserted and incorporated by reference.

42.    As described above, Defendants repeatedly gave false information, and misrepresented material facts relating to the progress of the loan modification process, the requirements thereof, the supposed "investor" extorting above market prices to effectuate a short sale, etc.

43.    Plaintiffs justifiably relied upon Defendants' representations.

44.     The negligent misrepresentations and reliance described above resulted in damage to Plaintiffs in an amount to be proven at trial, which exceeds the jurisdictional minimum of the Court.

## COUNT SIX -TORTUOUS FRAUDULENT CONCEALMENT

45.     All of the allegations set out above are reasserted and incorporated by reference.

46.     Alternatively and additionally, the Defendants intentionally prevented Plaintiffs from protecting his interest by the concealment of material facts described above.

47.     Plaintiffs justifiably relied upon the Banks' representations and the concealment of material facts, resulting in damages to be proven at trial which exceed the jurisdictional minimum of the Court

## COUNT SEVEN-TORTUOUS FAILURE TO HIRE.TRAIN OR SUPERVISE EMPLOYEES

48.     All of the allegations set out above are reasserted and incorporated by reference.

49.     At all times material hereto, the Defendants had a duty to reasonably hire, train or supervise employees necessary to conduct its affairs such that the public generally, and Plaintiffs specifically, would not be negligently harmed, which duty they failed, as described above. Additionally, Defendants were legally bound by the 2012 Consent Judgment to hire, train and supervise employees to "ensure" against the illegal acts set out above, and the damage to Plaintiff. described herein, would not occur.

EXHIBIT A
PAGE 18 OF 76

50.     As a result of the failure to hire. train or supervise employees, the Defendants caused damage to Plaintiff in an amount to be proven at trial which exceeds the jurisdictional minimum of the Court.

## COUNT EIGHT-BREACH OF CONSENT JUDGMENT

51.     All of the allegations set out above are reasserted and incorporated by reference.

52.     The illegal acts and practices described above violate the terms of the 2012 Consent Judgment as to conduct remedies promised by Defendants.

53.     As a result of the violation of the Consent Judgment, Plaintiff was damaged in an amount to be proven at trial which exceeds the jurisdictional minimum of the Court.

## COUNT NINE -TORTUOUS CONSTRUCTIVE FRAUD

54.     All of the allegations set out above are reasserted and incorporated by reference.

55.     At all times material hereto, Defendants had an equitable duty to Plaintiffs arising from the initial loan origination, the relationship between the parties. the parties joint venture at avoiding a foreclosure which would be costly to all parties, the Arizona statutes described above, the conduct remedies described above, the 2012 USDO] C]. and by virtue of the fact that breach of the duty would tend to deceive and cause injury to the public interest.

56.     The illegal acts and breaches of duty described above induced justifiable reliance by Plaintiff to his damage, constituted constructive fraud, and damaged Plaintiff in an amount to be proven at trial which exceeds the jurisdictional minimum of the Court.

## COUNT TEN -EQUITABLE ESTOPPLE

57.     All of the allegations set out above are reasserted and incorporated by reference.

58.     At the time of the misrepresentations and concealment of material fact described above, the true facts were known to Defendants. the true facts were not known to Plaintiff, and Defendants intended that Plaintiff act on the false or concealed facts.

59.     Plaintiff relied and acted upon these false facts and concealment to his detriment and was damaged thereby in an amount to be proven at trial which exceeds the jurisdictional minimum of the Court.

60.     Defendants illegal acts and misconduct should estop them from any position. litigation or conduct by which they would profit from their misconduct, including attempting to foreclose on Plaintiffs residence..

## COUNT ELEVEN -PROMISSORY ESTOPPLE

61.     All of the allegations set out above are reasserted and incorporated by reference.

62.     In the course of the transactions and commercial communications set out above, Defendants promised full compliance with the 2012 USDOJ CJ, and Arizona statute and common law, upon which promises Defendants should have foreseen Plaintiffs would rely, and Plaintiffs relied upon these promises to their detriment, such that Defendants should be estopped from foreclosing on Plaintiffs' home, or otherwise acting inconsistent with said promises.

## VIOLATION OF THE DUTY OF GOOD FAITH AND FAIR DEALING

63.     All of the allegations set out above are reasserted and incorporated by reference.

64.     Plaintiff and Defendants have longstanding contractual relationships which incorporates all supporting documentation relating thereto, including documents addressing

18

loss mitigation and loan modification, from which arises a duty of good faith and fair dealing, which duty Defendants failed as described above by a pattern of false. misleading and deceptive acts and practices. and violation of the 2012 USDOJ CJ. Arizona statutes and common law.

65.    As a result of the breach of the duty of good faith and fair dealing, Plaintiff was damaged in an amount to be proven at trial which exceeds the jurisdictional minimum of the Court.

## COUNT TWELVE-COMMON LAW FRAUD

66.    All of the allegations set out above are reasserted and incorporated by reference.

67.    In the course of conduct set out above, Defendants made representations which were false and material; Defendants knew the representations were false, or were ignorant of their truth, and intended that Plaintiff act on them in the manner reasonably contemplated; Plaintiff was ignorant of the falsity of the representations. relied upon and had a right to rely upon the representations, and suffered consequent and proximate injury.

68.    As a result of the fraud committed by Defendants, Plaintiff was damaged in an amount to be proven at trial, but which exceeds the jurisdictional amount of this Court.


WHEREFORE, Plaintiffs respectfully ask the following relief:

A. Judgment in favor of Plaintiffs in an amount to be proven at trial;

B. Pre and post judgment interest at the highest permissible rate;

C. Punitive damages in an amount to deter such future misconduct;

D. Incurred costs and attorney fees:

E. Injunctive relief to prevent future harm:

F. Trial by jury as to all issues so triable;

G. Such other relief to which they may appear entitled.


RESPECTFULLY SUBMITTED this 24th day of June, 2013.


By: _David W. Dow_____
      David W. Dow
      3104 E. Camelback Rd. #281
      Phoenix, Arizona 85016

EXHIBIT A
PAGE 22 OF 76

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

APR - 4 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

12 0361

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| BANK OF AMERICA CORP. *et al.*, | ) ) Civil Action No. _____ |
| Defendants. | ) ) ) ) ) ) ) ) ) |

**CONSENT JUDGMENT**

WHEREAS, Plaintiffs, the United States of America and the States of Alabama, Alaska,

Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii,

Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota,

Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,

New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, South

Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming,

the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of

Columbia filed their complaint on March 12, 2012, alleging that Bank of America Corporation,

Bank of America, N.A., BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans

Servicing, LP, Countrywide Home Loans, Inc., Countrywide Financial Corporation,

Countrywide Mortgage Ventures, LLC, and Countrywide Bank, FSB (collectively, for the sake

of convenience only, "Defendant") violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the Plaintiff States, the False Claims Act, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, the Servicemembers Civil Relief Act, and the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

WHEREAS, the parties have agreed to resolve their claims without the need for litigation;

WHEREAS, Defendant has consented to entry of this Consent Judgment without trial or adjudication of any issue of fact or law and to waive any appeal if the Consent Judgment is entered as submitted by the parties;

WHEREAS, Defendant, by entering into this Consent Judgment, does not admit the allegations of the Complaint other than those facts deemed necessary to the jurisdiction of this Court;

WHEREAS, the intention of the United States and the States in effecting this settlement is to remediate harms allegedly resulting from the alleged unlawful conduct of the Defendant;

AND WHEREAS, Defendant has agreed to waive service of the complaint and summons and hereby acknowledges the same;

NOW THEREFORE, without trial or adjudication of issue of fact or law, without this Consent Judgment constituting evidence against Defendant, and upon consent of Defendant, the Court finds that there is good and sufficient cause to enter this Consent Judgment, and that it is therefore ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355(a), and 1367, and under 31 U.S.C. § 3732(a) and (b), and over

2

Defendant. The Complaint states a claim upon which relief may be granted against Defendant. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 31 U.S.C. § 3732(a).

## II.   SERVICING STANDARDS

2.      Bank of America, N.A. shall comply with the Servicing Standards, attached hereto as Exhibit A, in accordance with their terms and Section A of Exhibit E, attached hereto.

## III.   FINANCIAL TERMS

3.      *Payment Settlement Amounts.* Bank of America Corporation and/or its affiliated entities shall pay or cause to be paid into an interest bearing escrow account to be established for this purpose the sum of $2,382,415,075, which sum shall be added to funds being paid by other institutions resolving claims in this litigation (which sum shall be known as the "Direct Payment Settlement Amount") and which sum shall be distributed in the manner and for the purposes specified in Exhibit B. Payment shall be made by electronic funds transfer no later than seven days after the Effective Date of this Consent Judgment, pursuant to written instructions to be provided by the United States Department of Justice. After the required payment has been made, Defendant shall no longer have any property right, title, interest or other legal claim in any funds held in escrow. The interest bearing escrow account established by this Paragraph 3 is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue Code of 1986, as amended. The Monitoring Committee established in Paragraph 8 shall, in its sole discretion, appoint an escrow agent ("Escrow Agent") who shall hold and distribute funds as provided herein. All costs and expenses of the Escrow Agent, including taxes, if any, shall be paid from the funds under its control, including any interest earned on the funds.

4.    *Payments to Foreclosed Borrowers.*  In accordance with written instructions from the State members of the Monitoring Committee, for the purposes set forth in Exhibit C, the Escrow Agent shall transfer from the escrow account to the Administrator appointed under Exhibit C $1,489,813,925.00 (the "Borrower Payment Amount") to enable the Administrator to provide cash payments to borrowers whose homes were finally sold or taken in foreclosure between and including January 1, 2008 and December 31, 2011; who submit claims for harm allegedly arising from the Covered Conduct (as that term is defined in Exhibit G hereto); and who otherwise meet criteria set forth by the State members of the Monitoring Committee.  The Borrower Payment Amount and any other funds provided to the Administrator for these purposes shall be administered in accordance with the terms set forth in Exhibit C.

5.    *Consumer Relief.*  Defendant shall provide $7,626,200,000 of relief to consumers who meet the eligibility criteria in the forms and amounts described in Paragraphs 1-8 of Exhibit D, and $948,000,000 of refinancing relief to consumers who meet the eligibility criteria in the forms and amounts described in Paragraph 9 of Exhibit D, to remediate harms allegedly caused by the alleged unlawful conduct of Defendant.  Defendant shall receive credit towards such obligation as described in Exhibit D.

## IV. ENFORCEMENT

6.    The Servicing Standards and Consumer Relief Requirements, attached as Exhibits A and D, are incorporated herein as the judgment of this Court and shall be enforced in accordance with the authorities provided in the Enforcement Terms, attached hereto as Exhibit E.

7.    The Parties agree that Joseph A. Smith, Jr. shall be the Monitor and shall have the authorities and perform the duties described in the Enforcement Terms, attached hereto as Exhibit E.

8.      Within fifteen (15) days of the Effective Date of this Consent Judgment, the

participating state and federal agencies shall designate an Administration and Monitoring

Committee (the "Monitoring Committee") as described in the Enforcement Terms. The

Monitoring Committee shall serve as the representative of the participating state and federal

agencies in the administration of all aspects of this and all similar Consent Judgments and the

monitoring of compliance with it by the Defendant.

## V.      RELEASES

9.      The United States and Defendant have agreed, in consideration for the terms

provided herein, for the release of certain claims, and remedies, as provided in the Federal

Release, attached hereto as Exhibit F. The United States and Defendant have also agreed that

certain claims, and remedies are not released, as provided in Paragraph 11 of Exhibit F. The

releases contained in Exhibit F shall become effective upon payment of the Direct Payment

Settlement Amount by Defendant.

10.     The State Parties and Defendant have agreed, in consideration for the terms

provided herein, for the release of certain claims, and remedies, as provided in the State Release,

attached hereto as Exhibit G. The State Parties and Defendant have also agreed that certain

claims, and remedies are not released, as provided in Part IV of Exhibit G. The releases

contained in Exhibit G shall become effective upon payment of the Direct Payment Settlement

Amount by Defendant.

## VI.     SERVICEMEMBERS CIVIL RELIEF ACT

11.      The United States and Defendant have agreed to resolve certain claims arising

under the Servicemembers Civil Relief Act ("SCRA") in accordance with the terms provided in

Exhibit H. Any obligations undertaken pursuant to the terms provided in Exhibit H, including

5

any obligation to provide monetary compensation to servicemembers, are in addition to the

obligations undertaken pursuant to the other terms of this Consent Judgment.  Only a payment to

an individual for a wrongful foreclosure pursuant to the terms of Exhibit H shall be reduced by

the amount of any payment from the Borrower Payment Amount.

## VII.   OTHER TERMS

12.     The United States and any State Party may withdraw from the Consent Judgment

and declare it null and void with respect to that party if the Consumer Relief Payments (as that

term is defined in Exhibit F (Federal Release)) required under this Consent Judgment are not

made and such non-payment is not cured within thirty days of written notice by the party.

13.     This Court retains jurisdiction for the duration of this Consent Judgment to

enforce its terms.  The parties may jointly seek to modify the terms of this Consent Judgment,

subject to the approval of this Court.  This Consent Judgment may be modified only by order of

this Court.

14.     The Effective Date of this Consent Judgment shall be the date on which the

Consent Judgment has been entered by the Court and has become final and non-appealable.  An

order entering the Consent Judgment shall be deemed final and non-appealable for this purpose if

there is no party with a right to appeal the order on the day it is entered.

15.     This Consent Judgment shall remain in full force and effect for three and one-half

years from the date it is entered ("the Term"), at which time Defendant's obligations under the

Consent Judgment shall expire, except that, pursuant to Exhibit E, Bank of America, N.A. shall

submit a final Quarterly Report for the last quarter or portion thereof falling within the Term and

cooperate with the Monitor's review of said report, which shall be concluded no later than six

months after the end of the Term.  Defendant shall have no further obligations under this

Consent Judgment six months after the expiration of the Term, but the Court shall retain jurisdiction for purposes of enforcing or remedying any outstanding violations that are identified in the final Monitor Report and that have occurred but not been cured during the Term.

16.     Except as otherwise agreed in Exhibit B, each party to this litigation will bear its own costs and attorneys' fees associated with this litigation.

17.     Nothing in this Consent Judgment shall relieve Defendant of its obligation to comply with applicable state and federal law.

18.     The United States and Defendant further agree to the additional terms contained in Exhibit I hereto.

19.     The sum and substance of the parties' agreement and of this Consent Judgment are reflected herein and in the Exhibits attached hereto. In the event of a conflict between the terms of the Exhibits and paragraphs 1-18 of this summary document, the terms of the Exhibits shall govern.

SO ORDERED this _4_ day of _April_ , 2012

_____

UNITED STATES DISTRICT JUDGE

7

EXHIBIT B

# EXHIBIT A

## Settlement Term Sheet

The provisions outlined below are intended to apply to loans secured by owner-occupied properties that serve as the primary residence of the borrower unless otherwise noted herein.

I.     FORECLOSURE AND BANKRUPTCY INFORMATION AND DOCUMENTATION.

Unless otherwise specified, these provisions shall apply to bankruptcy and foreclosures in all jurisdictions regardless of whether the jurisdiction has a judicial, non-judicial or quasi-judicial process for foreclosures and regardless of whether a statement is submitted during the foreclosure or bankruptcy process in the form of an affidavit, sworn statement or declarations under penalty of perjury (to the extent stated to be based on personal knowledge) ("Declaration").

A.     Standards for Documents Used in Foreclosure and Bankruptcy Proceedings.

1.     Servicer shall ensure that factual assertions made in pleadings (complaint, counterclaim, cross-claim, answer or similar pleadings), bankruptcy proofs of claim (including any facts provided by Servicer or based on information provided by the Servicer that are included in any attachment and submitted to establish the truth of such facts) ("POC"), Declarations, affidavits, and sworn statements filed by or on behalf of Servicer in judicial foreclosures or bankruptcy proceedings and notices of default, notices of sale and similar notices submitted by or on behalf of Servicer in non-judicial foreclosures are accurate and complete and are supported by competent and reliable evidence. Before a loan is referred to non-judicial foreclosure, Servicer shall ensure that it has reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and loan information.

2.     Servicer shall ensure that affidavits, sworn statements, and Declarations are based on personal knowledge, which may be based on the affiant's review of Servicer's books and records, in accordance with the evidentiary requirements of applicable state or federal law.

3.     Servicer shall ensure that affidavits, sworn statements and Declarations executed by Servicer's affiants are based on the affiant's review and personal knowledge of the accuracy and completeness of the assertions in the affidavit, sworn statement or Declaration, set out facts that Servicer reasonably believes would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Affiants shall confirm that they have reviewed competent and reliable evidence to substantiate the

borrower's default and the right to foreclose, including the borrower's loan status and required loan ownership information. If an affiant relies on a review of business records for the basis of its affidavit, the referenced business record shall be attached if required by applicable state or federal law or court rule. This provision does not apply to affidavits, sworn statements and Declarations signed by counsel based solely on counsel's personal knowledge (such as affidavits of counsel relating to service of process, extensions of time, or fee petitions) that are not based on a review of Servicer's books and records. Separate affidavits, sworn statements or Declarations shall be used when one affiant does not have requisite personal knowledge of all required information.

4.  Servicer shall have standards for qualifications, training and supervision of employees. Servicer shall train and supervise employees who regularly prepare or execute affidavits, sworn statements or Declarations. Each such employee shall sign a certification that he or she has received the training. Servicer shall oversee the training completion to ensure each required employee properly and timely completes such training. Servicer shall maintain written records confirming that each such employee has completed the training and the subjects covered by the training.

5.  Servicer shall review and approve standardized forms of affidavits, standardized forms of sworn statements, and standardized forms of Declarations prepared by or signed by an employee or officer of Servicer, or executed by a third party using a power of attorney on behalf of Servicer, to ensure compliance with applicable law, rules, court procedure, and the terms of this Agreement ("the Agreement").

6.  Affidavits, sworn statements and Declarations shall accurately identify the name of the affiant, the entity of which the affiant is an employee, and the affiant's title.

7.  Affidavits, sworn statements and Declarations, including their notarization, shall fully comply with all applicable state law requirements.

8.  Affidavits, sworn statements and Declarations shall not contain information that is false or unsubstantiated. This requirement shall not preclude Declarations based on information and belief where so stated.

9.  Servicer shall assess and ensure that it has an adequate number of employees and that employees have reasonable time to prepare, verify, and execute pleadings, POCs, motions for relief from stay ("MRS"), affidavits, sworn statements and Declarations.

**EXHIBIT A
PAGE 34 OF 76**

10. Servicer shall not pay volume-based or other incentives to employees or third-party providers or trustees that encourage undue haste or lack of due diligence over quality.

11. Affiants shall be individuals, not entities, and affidavits, sworn statements and Declarations shall be signed by hand signature of the affiant (except for permitted electronic filings). For such documents, except for permitted electronic filings, signature stamps and any other means of electronic or mechanical signature are prohibited.

12. At the time of execution, all information required by a form affidavit, sworn statement or Declaration shall be complete.

13. Affiants shall date their signatures on affidavits, sworn statements or Declarations.

14. Servicer shall maintain records that identify all notarizations of Servicer documents executed by each notary employed by Servicer.

15. Servicer shall not file a POC in a bankruptcy proceeding which, when filed, contained materially inaccurate information. In cases in which such a POC may have been filed, Servicer shall not rely on such POC and shall (a) in active cases, at Servicer's expense, take appropriate action, consistent with state and federal law and court procedure, to substitute such POC with an amended POC as promptly as reasonably practicable (and, in any event, not more than 30 days) after acquiring actual knowledge of such material inaccuracy and provide appropriate written notice to the borrower or borrower's counsel; and (b) in other cases, at Servicer's expense, take appropriate action after acquiring actual knowledge of such material inaccuracy.

16. Servicer shall not rely on an affidavit of indebtedness or similar affidavit, sworn statement or Declaration filed in a pending pre-judgment judicial foreclosure or bankruptcy proceeding which (a) was required to be based on the affiant's review and personal knowledge of its accuracy but was not, (b) was not, when so required, properly notarized, or (c) contained materially inaccurate information in order to obtain a judgment of foreclosure, order of sale, relief from the automatic stay or other relief in bankruptcy. In pending cases in which such affidavits, sworn statements or Declarations may have been filed, Servicer shall, at Servicer's expense, take appropriate action, consistent with state and federal law and court procedure, to substitute such affidavits with new affidavits and provide appropriate written notice to the borrower or borrower's counsel.

A-3

17.    In pending post-judgment. pre-sale cases in judicial foreclosure proceedings in which an affidavit or sworn statement was filed which was required to be based on the affiant's review and personal knowledge of its accuracy but may not have been, or that may not have. when so required, been properly notarized, and such affidavit or sworn statement has not been re-filed, Servicer, unless prohibited by state or local law or court rule. will provide written notice to borrower at borrower's address of record or borrower's counsel prior to proceeding with a foreclosure sale or eviction proceeding.

18.    In all states. Servicer shall send borrowers a statement setting forth facts supporting Servicer's or holder's right to foreclose and containing the information required in paragraphs I.B.6 (items available upon borrower request). I.B.10 (account statement). I.C.2 and I.C.3 (ownership statement). and IV.B.13 (loss mitigation statement) herein. Servicer shall send this statement to the borrower in one or more communications no later than 14 days prior to referral to foreclosure attorney or foreclosure trustee. Servicer shall provide the Monitoring Committee with copies of proposed form statements for review before implementation.

B.    Requirements for Accuracy and Verification of Borrower's Account Information.

1.    Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information. including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information. which may be in either electronic or paper format.

2.    For any loan on which interest is calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation. Servicer shall promptly accept and apply all borrower payments. including cure payments (where authorized by law or contract). trial modification payments. as well as non-conforming payments, unless such application conflicts with contract provisions or prevailing law. Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the address specified by Servicer and credited as of the date received to borrower's account. Each monthly payment shall be applied in the order specified in the loan documents.

3.    For any loan on which interest is not calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation. Servicer shall promptly accept and apply all borrower conforming

payments, including cure payments (where authorized by law or contract), unless such application conflicts with contract provisions or prevailing law.  Servicer shall continue to accept trial modification payments consistent with existing payment application practices.  Servicer shall ensure that properly identified payments shall be posted no more than two business days after receipt at the address specified by Servicer.  Each monthly payment shall be applied in the order specified in the loan documents.

    a.    Servicer shall accept and apply at least two non-conforming payments from the borrower, in accordance with this subparagraph, when the payment, whether on its own or when combined with a payment made by another source, comes within $50.00 of the scheduled payment, including principal and interest and, where applicable, taxes and insurance.

    b.    Except for payments described in paragraph I.B.3.a. Servicer may post partial payments to a suspense or unapplied funds account, provided that Servicer (1) discloses to the borrower the existence of and any activity in the suspense or unapplied funds account; (2) credits the borrower's account with a full payment as of the date that the funds in the suspense or unapplied funds account are sufficient to cover such full payment; and (3) applies payments as required by the terms of the loan documents. Servicer shall not take funds from suspense or unapplied funds accounts to pay fees until all unpaid contractual interest, principal, and escrow amounts are paid and brought current or other final disposition of the loan.

4.    Notwithstanding the provisions above, Servicer shall not be required to accept payments which are insufficient to pay the full balance due after the borrower has been provided written notice that the contract has been declared in default and the remaining payments due under the contract have been accelerated.

5.    Servicer shall provide to borrowers (other than borrowers in bankruptcy or borrowers who have been referred to or are going through foreclosure) adequate information on monthly billing or other account statements to show in clear and conspicuous language:

    a.    total amount due;

    b.    allocation of payments, including a notation if any payment has been posted to a "suspense or unapplied funds account";

A-5

c.  unpaid principal;

d.  fees and charges for the relevant time period;

e.  current escrow balance; and

f.  reasons for any payment changes, including an interest rate
    or escrow account adjustment, no later than 21 days before
    the new amount is due (except in the case of loans as to
    which interest accrues daily or the rate changes more
    frequently than once every 30 days):

Statements as described above are not required to be delivered with
respect to any fixed rate residential mortgage loan as to which the
borrower is provided a coupon book.

6.  In the statements described in paragraphs I.A.18 and III.B.1.a,
    Servicer shall notify borrowers that they may receive, upon written
    request:

    a.  A copy of the borrower's payment history since the
        borrower was last less than 60 days past due;

    b.  A copy of the borrower's note;

    c.  If Servicer has commenced foreclosure or filed a POC,
        copies of any assignments of mortgage or deed of trust
        required to demonstrate the right to foreclose on the
        borrower's note under applicable state law; and

    d.  The name of the investor that holds the borrower's loan.

7.  Servicer shall adopt enhanced billing dispute procedures, including
    for disputes regarding fees. These procedures will include:

    a.  Establishing readily available methods for customers to
        lodge complaints and pose questions, such as by providing
        toll-free numbers and accepting disputes by email;

    b.  Assessing and ensuring adequate and competent staff to
        answer and respond to consumer disputes promptly;

    c.  Establishing a process for dispute escalation;

    d.  Tracking the resolution of complaints; and

    e.  Providing a toll-free number on monthly billing statements.

8.  Servicer shall take appropriate action to promptly remediate any
    inaccuracies in borrowers' account information, including:

    a.  Correcting the account information;

    b.  Providing cash refunds or account credits; and

    c.  Correcting inaccurate reports to consumer credit reporting

A-6

agencies.

9.   Servicer's systems to record account information shall be periodically independently reviewed for accuracy and completeness by an independent reviewer.

10.  As indicated in paragraph I.A.18, Servicer shall send the borrower an itemized plain language account summary setting forth each of the following items, to the extent applicable:

    a.   The total amount needed to reinstate or bring the account current, and the amount of the principal obligation under the mortgage;

    b.   The date through which the borrower's obligation is paid;

    c.   The date of the last full payment;

    d.   The current interest rate in effect for the loan (if the rate is effective for at least 30 days);

    e.   The date on which the interest rate may next reset or adjust (unless the rate changes more frequently than once every 30 days);

    f.   The amount of any prepayment fee to be charged, if any;

    g.   A description of any late payment fees;

    h.   A telephone number or electronic mail address that may be used by the obligor to obtain information regarding the mortgage; and

    i.   The names, addresses, telephone numbers, and Internet addresses of one or more counseling agencies or programs approved by HUD (http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm).

11.  In active chapter 13 cases, Servicer shall ensure that:

    a.   prompt and proper application of payments is made on account of (a) pre-petition arrearage amounts and (b) post-petition payment amounts and posting thereof as of the successful consummation of the effective confirmed plan;

    b.   the debtor is treated as being current so long as the debtor is making payments in accordance with the terms of the then-effective confirmed plan and any later effective payment change notices; and

    c.   as of the date of dismissal of a debtor's bankruptcy case, entry of an order granting Servicer relief from the stay, or entry of an order granting the debtor a discharge, there is a reconciliation of payments received with respect to the

EXHIBIT A
PAGE 39 OF 76

debtor's obligations during the case and appropriately update the Servicer's systems of record. In connection with such reconciliation, Servicer shall reflect the waiver of any fee, expense or charge pursuant to paragraphs III.B.1.c.i or . III.B.1.d.

C.     Documentation of Note, Holder Status and Chain of Assignment.

1.     Servicer shall implement processes to ensure that Servicer or the foreclosing entity has a documented enforceable interest in the promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a proper party to the foreclosure action.

2.     Servicer shall include a statement in a pleading, affidavit of indebtedness or similar affidavits in court foreclosure proceedings setting forth the basis for asserting that the foreclosing party has the right to foreclose.

3.     Servicer shall set forth the information establishing the party's right to foreclose as set forth in I.C.2 in a communication to be sent to the borrower as indicated in I.A.18.

4.     If the original note is lost or otherwise unavailable, Servicer shall comply with applicable law in an attempt to establish ownership of the note and the right to enforcement. Servicer shall ensure good faith efforts to obtain or locate a note lost while in the possession of Servicer or Servicer's agent and shall ensure that Servicer and Servicer's agents who are expected to have possession of notes or assignments of mortgage on behalf of Servicer adopt procedures that are designed to provide assurance that the Servicer or Servicer's agent would locate a note or assignment of mortgage if it is in the possession or control of the Servicer or Servicer's agent, as the case may be. In the event that Servicer prepares or causes to be prepared a lost note or lost assignment affidavit with respect to an original note or assignment lost while in Servicer's control, Servicer shall use good faith efforts to obtain or locate the note or assignment in accordance with its procedures. In the affidavit, sworn statement or other filing documenting the lost note or assignment, Servicer shall recite that Servicer has made a good faith effort in accordance with its procedures for locating the lost note or assignment.

5.     Servicer shall not intentionally destroy or dispose of original notes that are still in force.

6.     Servicer shall ensure that mortgage assignments executed by or on behalf of Servicer are executed with appropriate legal authority, accurately reflective of the completed transaction and properly acknowledged.

A-8

D.      Bankruptcy Documents.

1.      **Proofs of Claim ("POC")**.  Servicer shall ensure that POCs filed on behalf of Servicer are documented in accordance with the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any applicable local rule or order ("bankruptcy law"). Unless not permitted by statute or rule, Servicer shall ensure that each POC is documented by attaching:

a.      The original or a duplicate of the note, including all indorsements; a copy of any mortgage or deed of trust securing the notes (including, if applicable, evidence of recordation in the applicable land records); and copies of any assignments of mortgage or deed of trust required to demonstrate the right to foreclose on the borrower's note under applicable state law (collectively, "Loan Documents"). If the note has been lost or destroyed, a lost note affidavit shall be submitted.

b.      If, in addition to its principal amount, a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim (including any expenses or charges based on an escrow analysis as of the date of filing) at least in the detail specified in the current draft of Official Form B 10 (effective December 2011) ("Official Form B 10") Attachment A.

c.      A statement of the amount necessary to cure any default as of the date of the petition shall be filed with the proof of claim.

d.      If a security interest is claimed in property that is the debtor's principal residence, the attachment prescribed by the appropriate Official Form shall be filed with the proof of claim.

e.      Servicer shall include a statement in a POC setting forth the basis for asserting that the applicable party has the right to foreclose.

f.      The POC shall be signed (either by hand or by appropriate electronic signature) by the responsible person under penalty of perjury after reasonable investigation, stating that the information set forth in the POC is true and correct to the best of such responsible person's knowledge, information, and reasonable belief, and clearly identify the responsible person's employer and position or title with the

**EXHIBIT A
PAGE 41 OF 76**

employer.

2.   **Motions for Relief from Stay ("MRS")**.  Unless not permitted by bankruptcy law, Servicer shall ensure that each MRS in a chapter 13 proceeding is documented by attaching:

a.   To the extent not previously submitted with a POC, a copy of the Loan Documents; if such documents were previously submitted with a POC, a statement to that effect.  If the promissory note has been lost or destroyed, a lost note affidavit shall be submitted;

b.   To the extent not previously submitted with a POC, Servicer shall include a statement in an MRS setting forth the basis for asserting that the applicable party has the right to foreclose;

c.   An affidavit, sworn statement or Declaration made by Servicer or based on information provided by Servicer ("MRS affidavit" (which term includes, without limitation, any facts provided by Servicer that are included in any attachment and submitted to establish the truth of such facts) setting forth:

   i.   whether there has been a default in paying pre-petition arrearage or post-petition amounts (an "MRS delinquency");

   ii.   if there has been such a default, (a) the unpaid principal balance, (b) a description of any default with respect to the pre-petition arrearage, (c) a description of any default with respect to the post-petition amount (including, if applicable, any escrow shortage), (d) the amount of the pre-petition arrearage (if applicable), (e) the post-petition payment amount, (f) for the period since the date of the first post-petition or pre-petition default that is continuing and has not been cured, the date and amount of each payment made (including escrow payments) and the application of each such payment, and (g) the amount, date and description of each fee or charge applied to such pre-petition amount or post-petition amount since the later of the date of the petition or the preceding statement pursuant to paragraph III.B.1.a; and

   iii.   all amounts claimed, including a statement of the amount necessary to cure any default on or about the date of the MRS.

A-10

      d.     All other attachments prescribed by statute, rule, or law.

      e.     Servicer shall ensure that any MRS discloses the terms of any trial period or permanent loan modification plan pending at the time of filing of a MRS or whether the debtor is being evaluated for a loss mitigation option.

E.    Quality Assurance Systems Review.

   1.    Servicer shall conduct regular reviews, not less than quarterly, of a statistically valid sample of affidavits, sworn statements, Declarations filed by or on behalf of Servicer in judicial foreclosures or bankruptcy proceedings and notices of default, notices of sale and similar notices submitted in non-judicial foreclosures to ensure that the documents are accurate and comply with prevailing law and this Agreement.

      a.     The reviews shall also verify the accuracy of the statements in affidavits, sworn statements, Declarations and documents used to foreclose in non-judicial foreclosures, the account summary described in paragraph I.B.10, the ownership statement described in paragraph I.C.2, and the loss mitigation statement described in paragraph IV.B.13 by reviewing the underlying information. Servicer shall take appropriate remedial steps if deficiencies are identified, including appropriate remediation in individual cases.

      b.     The reviews shall also verify the accuracy of the statements in affidavits, sworn statements and Declarations submitted in bankruptcy proceedings. Servicer shall take appropriate remedial steps if deficiencies are identified, including appropriate remediation in individual cases.

   2.    The quality assurance steps set forth above shall be conducted by Servicer employees who are separate and independent of employees who prepare foreclosure or bankruptcy affidavits, sworn statements, or other foreclosure or bankruptcy documents.

   3.    Servicer shall conduct regular pre-filing reviews of a statistically valid sample of POCs to ensure that the POCs are accurate and comply with prevailing law and this Agreement. The reviews shall also verify the accuracy of the statements in POCs. Servicer shall take appropriate remedial steps if deficiencies are identified, including appropriate remediation in individual cases. The pre-filing review shall be conducted by Servicer employees who are separate and independent of the persons who prepared the applicable POCs.

EXHIBIT A
PAGE 43 OF 76

4. Servicer shall regularly review and assess the adequacy of its internal controls and procedures with respect to its obligations under this Agreement, and implement appropriate procedures to address deficiencies.

## II. THIRD-PARTY PROVIDER OVERSIGHT.

A. *Oversight Duties Applicable to All Third-Party Providers.*

Servicer shall adopt policies and processes to oversee and manage foreclosure firms, law firms, foreclosure trustees, subservicers and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) retained by or on behalf of Servicer that provide foreclosure, bankruptcy or mortgage servicing activities (including loss mitigation) (collectively, such activities are "Servicing Activities" and such providers are "Third-Party Providers"), including:

1. Servicer shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability.

2. Servicer shall amend agreements, engagement letters, or oversight policies, or enter into new agreements or engagement letters, with Third-Party Providers to require them to comply with Servicer's applicable policies and procedures (which will incorporate any applicable aspects of this Agreement) and applicable state and federal laws and rules.

3. Servicer shall ensure that agreements, contracts or oversight policies provide for adequate oversight, including measures to enforce Third-Party Provider contractual obligations, and to ensure timely action with respect to Third-Party Provider performance failures.

4. Servicer shall ensure that foreclosure and bankruptcy counsel and foreclosure trustees have appropriate access to information from Servicer's books and records necessary to perform their duties in preparing pleadings and other documents submitted in foreclosure and bankruptcy proceedings.

5. Servicer shall ensure that all information provided by or on behalf of Servicer to Third-Party Providers in connection with providing Servicing Activities is accurate and complete.

6. Servicer shall conduct periodic reviews of Third-Party Providers. These reviews shall include:

   a. A review of a sample of the foreclosure and bankruptcy documents prepared by the Third-Party Provider, to provide for compliance with applicable state and federal law and

A-12

this Agreement in connection with the preparation of the documents, and the accuracy of the facts contained therein;

b.   A review of the fees and costs assessed by the Third-Party Provider to provide that only fees and costs that are lawful, reasonable and actually incurred are charged to borrowers and that no portion of any fees or charges incurred by any Third-Party Provider for technology usage, connectivity, or electronic invoice submission is charged as a cost to the borrower;

c.   A review of the Third-Party Provider's processes to provide for compliance with the Servicer's policies and procedures concerning Servicing Activities;

d.   A review of the security of original loan documents maintained by the Third-Party Provider;

e.   A requirement that the Third-Party Provider disclose to the Servicer any imposition of sanctions or professional disciplinary action taken against them for misconduct related to performance of Servicing Activities; and

f.   An assessment of whether bankruptcy attorneys comply with the best practice of determining whether a borrower has made a payment curing any MRS delinquency within two business days of the scheduled hearing date of the related MRS.

The quality assurance steps set forth above shall be conducted by Servicer employees who are separate and independent of employees who prepare foreclosure or bankruptcy affidavits, sworn documents, Declarations or other foreclosure or bankruptcy documents.

7.   Servicer shall take appropriate remedial steps if problems are identified through this review or otherwise, including, when appropriate, terminating its relationship with the Third-Party Provider.

8.   Servicer shall adopt processes for reviewing and appropriately addressing customer complaints it receives about Third-Party Provider services.

9.   Servicer shall regularly review and assess the adequacy of its internal controls and procedures with respect to its obligations under this Section, and take appropriate remedial steps if deficiencies are identified, including appropriate remediation in individual cases.

A-13

**EXHIBIT A
PAGE 45 OF 76**

B.  *Additional Oversight of Activities by Third-Party Providers.*

   1.  Servicer shall require a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for Servicer, on a periodic basis, as qualified to serve as a Third-Party Provider to Servicer, including that attorneys have the experience and competence necessary to perform the services requested.

   2.  Servicer shall ensure that attorneys are licensed to practice in the relevant jurisdiction, have the experience and competence necessary to perform the services requested, and that their services comply with applicable rules, regulations and applicable law (including state law prohibitions on fee splitting).

   3.  Servicer shall ensure that foreclosure and bankruptcy counsel and foreclosure trustees have an appropriate Servicer contact to assist in legal proceedings and to facilitate loss mitigation questions on behalf of the borrower.

   4.  Servicer shall adopt policies requiring Third-Party Providers to maintain records that identify all notarizations of Servicer documents executed by each notary employed by the Third-Party Provider.

III.  **BANKRUPTCY.**

A.  General.

   1.  The provisions, conditions and obligations imposed herein are intended to be interpreted in accordance with applicable federal, state and local laws, rules and regulations. Nothing herein shall require a Servicer to do anything inconsistent with applicable state or federal law, including the applicable bankruptcy law or a court order in a bankruptcy case.

   2.  Servicer shall ensure that employees who are regularly engaged in servicing mortgage loans as to which the borrower or mortgagor is in bankruptcy receive training specifically addressing bankruptcy issues.

B.  Chapter 13 Cases.

   1.  In any chapter 13 case, Servicer shall ensure that:

      a.  So long as the debtor is in a chapter 13 case, within 180 days after the date on which the fees, expenses, or charges are incurred, file and serve on the debtor, debtor's counsel, and the trustee a notice in a form consistent with Official Form B10 (Supplement 2) itemizing fees, expenses, or charges (1) that were incurred in connection with the claim

A-14

after the bankruptcy case was filed, (2) that the holder asserts are recoverable against the debtor or against the debtor's principal residence, and (3) that the holder intends to collect from the debtor.

b.  Servicer replies within time periods established under bankruptcy law to any notice that the debtor has completed all payments under the plan or otherwise paid in full the amount required to cure any pre-petition default.

c.  If the Servicer fails to provide information as required by paragraph III.B.1.a with respect to a fee, expense or charge within 180 days of the incurrence of such fee, expense, or charge, then,

   i.  Except for independent charges ("Independent charge") paid by the Servicer that is either (A) specifically authorized by the borrower or (B) consists of amounts advanced by Servicer in respect of taxes, homeowners association fees, liens or insurance, such fee, expense or charge shall be deemed waived and may not be collected from the borrower.

   ii.  In the case of an Independent charge, the court may, after notice and hearing, take either or both of the following actions:

      (a)  preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or

      (b)  award other appropriate relief, including reasonable expenses and attorney's fees caused by the failure.

d.  If the Servicer fails to provide information as required by paragraphs III.B.1.a or III.B.1.b and bankruptcy law with respect to a fee, expense or charge (other than an Independent Charge) incurred more than 45 days before the date of the reply referred to in paragraph III.B.1.b, then such fee, expense or charge shall be deemed waived and may not be collected from the borrower.

e.  Servicer shall file and serve on the debtor, debtor's counsel, and the trustee a notice in a form consistent with the current draft of Official Form B10 (Supplement 1) (effective

A-15

December 2011) of any change in the payment amount. including any change that results from an interest rate or escrow account adjustment. no later than 21 days before a payment in the new amount is due. Servicer shall waive and not collect any late charge or other fees imposed solely as a result of the failure of the borrower timely to make a payment attributable to the failure of Servicer to give such notice timely.

IV. LOSS MITIGATION.

These requirements are intended to apply to both government-sponsored and proprietary loss mitigation programs and shall apply to subservicers performing loss mitigation services on Servicer's behalf.

A.    Loss Mitigation Requirements.

1.    Servicer shall be required to notify potentially eligible borrowers of currently available loss mitigation options prior to foreclosure referral. Upon the timely receipt of a complete loan modification application. Servicer shall evaluate borrowers for all available loan modification options for which they are eligible prior to referring a borrower to foreclosure and shall facilitate the submission and review of loss mitigation applications. The foregoing notwithstanding. Servicer shall have no obligation to solicit borrowers who are in bankruptcy.

2.    Servicer shall offer and facilitate loan modifications for borrowers rather than initiate foreclosure when such loan modifications for which they are eligible are net present value (NPV) positive and meet other investor. guarantor. insurer and program requirements.

3.    Servicer shall allow borrowers enrolled in a trial period plan under prior HAMP guidelines (where borrowers were not pre-qualified) and who made all required trial period payments. but were later denied a permanent modification. the opportunity to reapply for a HAMP or proprietary loan modification using current financial information.

4.    Servicer shall promptly send a final modification agreement to borrowers who have enrolled in a trial period plan under current HAMP guidelines (or fully underwritten proprietary modification programs with a trial payment period) and who have made the required number of timely trial period payments. where the modification is underwritten prior to the trial period and has received any necessary investor. guarantor or insurer approvals. The borrower shall then be converted by Servicer to a permanent modification upon execution of the final modification documents.

A-16

EXHIBIT A
PAGE 48 OF 76

consistent with applicable program guidelines. absent evidence of fraud.

B.    Dual Track Restricted.

1.    If a borrower has not already been referred to foreclosure. Servicer shall not refer an eligible borrower's account to foreclosure while the borrower's complete application for any loan modification program is pending if Servicer received (a) a complete loan modification application no later than day 120 of delinquency. or (b) a substantially complete loan modification application (missing only any required documentation of hardship) no later than day 120 of delinquency and Servicer receives any required hardship documentation no later than day 130 of delinquency. Servicer shall not make a referral to foreclosure of an eligible borrower who so provided an application until:

a.    Servicer determines (after the automatic review in paragraph IV.G.1) that the borrower is not eligible for a loan modification. or

b.    If borrower does not accept an offered foreclosure prevention alternative within 14 days of the evaluation notice. the earlier of (i) such 14 days. and (ii) borrower's decline of the foreclosure prevention offer.

2.    If borrower accepts the loan modification resulting from Servicer's evaluation of the complete loan modification application referred to in paragraph IV.B.1 (verbally. in writing (including e-mail responses) or by submitting the first trial modification payment) within 14 days of Servicer's offer of a loan modification. then the Servicer shall delay referral to foreclosure until (a) if the Servicer fails timely to receive the first trial period payment. the last day for timely receiving the first trial period payment. and (b) if the Servicer timely receives the first trial period payment. after the borrower breaches the trial plan.

3.    If the loan modification requested by a borrower as described in paragraph IV.B.1 is denied. except when otherwise required by federal or state law or investor directives, if borrower is entitled to an appeal under paragraph IV.G.3. Servicer will not proceed to a foreclosure sale until the later of (if applicable):

a.    expiration of the 30-day appeal period: and

b.    if the borrower appeals the denial. until the later of (if applicable) (i) if Servicer denies borrower's appeal. 15 days after the letter denying the appeal, (ii) if the Servicer sends borrower a letter granting his or her appeal and offering a loan modification. 14 days after the date of such offer. (iii)

A-17

if the borrower timely accepts the loan modification offer (verbally, in writing (including e-mail responses), or by making the first trial period payment), after the Servicer fails timely to receive the first trial period payment, and (iv) if the Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

4.    If, after an eligible borrower has been referred to foreclosure, the Servicer receives a complete application from the borrower within 30 days after the Post Referral to Foreclosure Solicitation Letter, then while such loan modification application is pending, Servicer shall not move for foreclosure judgment or order of sale (or, if a motion has already been filed, shall take reasonable steps to avoid a ruling on such motion), or seek a foreclosure sale. If Servicer offers the borrower a loan modification, Servicer shall not move for judgment or order of sale, (or, if a motion has already been filed, shall take reasonable steps to avoid a ruling on such motion), or seek a foreclosure sale until the earlier of (a) 14 days after the date of the related offer of a loan modification, and (b) the date the borrower declines the loan modification offer. If the borrower accepts the loan modification offer (verbally, in writing (including e-mail responses) or by submitting the first trial modification payment) within 14 days after the date of the related offer of loan modification, Servicer shall continue this delay until the later of (if applicable) (A) the failure by the Servicer timely to receive the first trial period payment, and (B) if the Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

5.    If the loan modification requested by a borrower described in paragraph IV.B.4 is denied, then, except when otherwise required by federal or state law or investor directives, if borrower is entitled to an appeal under paragraph IV.G.3, Servicer will not proceed to a foreclosure sale until the later of (if applicable):

a.    expiration of the 30-day appeal period; and

b.    if the borrower appeals the denial, until the later of (if applicable) (i) if Servicer denies borrower's appeal, 15 days after the letter denying the appeal, (ii) if the Servicer sends borrower a letter granting his or her appeal and offering a loan modification, 14 days after the date of such offer, (iii) if the borrower timely accepts the loan modification offer (verbally, in writing (including e-mail responses), or by making the first trial period payment), after the failure of the Servicer timely to receive the first trial period payment, and (iv) if the Servicer timely receives the first trial period

A-18

payment. after the borrower breaches the trial plan.

6. If. after an eligible borrower has been referred to foreclosure. Servicer receives a complete loan modification application more than 30 days after the Post Referral to Foreclosure Solicitation Letter. but more than 37 days before a foreclosure sale is scheduled. then while such loan modification application is pending. Servicer shall not proceed with the foreclosure sale. If Servicer offers a loan modification. then Servicer shall delay the foreclosure sale until the earlier of (i) 14 days after the date of the related offer of loan modification. and (ii) the date the borrower declines the loan modification offer. If the borrower accepts the loan modification offer (verbally. in writing (including e-mail responses) or by submitting the first trial modification payment) within 14 days. Servicer shall delay the foreclosure sale until the later of (if applicable) (A) the failure by the Servicer timely to receive the first trial period payment. and (B) if the Servicer timely receives the first trial period payment. after the borrower breaches the trial plan.

7. If the loan modification requested by a borrower described in paragraph IV.B.6 is denied and it is reasonable to believe that more than 90 days remains until a scheduled foreclosure date or the first date on which a sale could reasonably be expected to be scheduled and occur. then. except when otherwise required by federal or state law or investor directives. if borrower is entitled to an appeal under paragraph IV.G.3.a. Servicer will not proceed to a foreclosure sale until the later of (if applicable):

   a. expiration of the 30-day appeal period; and

   b. if the borrower appeals the denial. until the later of (if applicable) (i) if Servicer denies borrower's appeal. 15 days after the letter denying the appeal. (ii) if the Servicer sends borrower a letter granting his or her appeal and offering a loan modification. 14 days after the date of such offer. (iii) if the borrower timely accepts the loan modification offer (verbally. in writing (including e-mail responses), or by making the first trial period payment). after the Servicer fails timely to receive the first trial period payment, and (iv) if the Servicer timely receives the first trial period payment. after the borrower breaches the trial plan.

8. If. after an eligible borrower has been referred to foreclosure. Servicer receives a complete loan modification application more than 30 days after the Post Referral to Foreclosure Solicitation Letter. but within 37 to 15 days before a foreclosure sale is scheduled. then Servicer shall conduct an expedited review of the

A-19

borrower and. if the borrower is extended a loan modification offer, Servicer shall postpone any foreclosure sale until the earlier of (a) 14 days after the date of the related evaluation notice. and (b) the date the borrower declines the loan modification offer.  If the borrower timely accepts the loan modification offer (either in writing or by submitting the first trial modification payment). Servicer shall delay the foreclosure sale until the later of (if applicable) (A) the failure by the Servicer timely to receive the first trial period payment. and (B) if the Servicer timely receives the first trial period payment. after the borrower breaches the trial plan.

9.      If. after an eligible borrower has been referred to foreclosure. the Servicer receives a complete loan modification application more than 30 days after the Post Referral to Foreclosure Solicitation Letter and less than 15 days before a scheduled foreclosure sale. Servicer must notify the borrower before the foreclosure sale date as to Servicer's determination (if its review was completed) or inability to complete its review of the loan modification application.  If Servicer makes a loan modification offer to the borrower. then Servicer shall postpone any sale until the earlier of (a) 14 days after the date of the related evaluation notice, and (b) the date the borrower declines the loan modification offer. If the borrower timely accepts a loan modification offer (either in writing or by submitting the first trial modification payment), Servicer shall delay the foreclosure sale until the later of (if applicable) (A) the failure by the Servicer timely to receive the first trial period payment. and (B) if the Servicer timely receives the first trial period payment. after the borrower breaches the trial plan.

10.     For purposes of this section IV.B. Servicer shall not be responsible for failing to obtain a delay in a ruling on a judgment or failing to delay a foreclosure sale if Servicer made a request for such delay. pursuant to any state or local law. court rule or customary practice, and such request was not approved.

11.     Servicer shall not move to judgment or order of sale or proceed with a foreclosure sale under any of the following circumstances:

        a.      The borrower is in compliance with the terms of a trial loan modification. forbearance. or repayment plan; or

        b.      A short sale or deed-in-lieu of foreclosure has been approved by all parties (including. for example. first lien investor. junior lien holder and mortgage insurer. as applicable). and proof of funds or financing has been provided to Servicer.

EXHIBIT A
PAGE 52 OF 76

12.  If a foreclosure or trustee's sale is continued (rather than cancelled) to provide time to evaluate loss mitigation options, Servicer shall promptly notify borrower in writing of the new date of sale (without delaying any related foreclosure sale).

13.  As indicated in paragraph I.A.18. Servicer shall send a statement to the borrower outlining loss mitigation efforts undertaken with respect to the borrower prior to foreclosure referral. If no loss mitigation efforts were offered or undertaken. Servicer shall state whether it contacted or attempted to contact the borrower and, if applicable, why the borrower was ineligible for a loan modification or other loss mitigation options.

14.  Servicer shall ensure timely and accurate communication of or access to relevant loss mitigation status and changes in status to its foreclosure attorneys. bankruptcy attorneys and foreclosure trustees and, where applicable. to court-mandated mediators.

C.  Single Point of Contact.

1.  Servicer shall establish an easily accessible and reliable single point of contact ("SPOC") for each potentially-eligible first lien mortgage borrower so that the borrower has access to an employee of Servicer to obtain information throughout the loss mitigation. loan modification and foreclosure processes.

2.  Servicer shall initially identify the SPOC to the borrower promptly after a potentially-eligible borrower requests loss mitigation assistance. Servicer shall provide one or more direct means of communication with the SPOC on loss mitigation-related correspondence with the borrower. Servicer shall promptly provide updated contact information to the borrower if the designated SPOC is reassigned. no longer employed by Servicer. or otherwise not able to act as the primary point of contact.

a.  Servicer shall ensure that debtors in bankruptcy are assigned to a SPOC specially trained in bankruptcy issues.

3.  The SPOC shall have primary responsibility for:

a.  Communicating the options available to the borrower. the actions the borrower must take to be considered for these options and the status of Servicer's evaluation of the borrower for these options;

b.  Coordinating receipt of all documents associated with loan modification or loss mitigation activities;

c.  Being knowledgeable about the borrower's situation and current status in the delinquency/imminent default resolution process: and

A-21

    d.    Ensuring that a borrower who is not eligible for MHA programs is considered for proprietary or other investor loss mitigation options.

4.    The SPOC shall, at a minimum, provide the following services to borrowers:

    a.    Contact borrower and introduce himself/herself as the borrower's SPOC;

    b.    Explain programs for which the borrower is eligible;

    c.    Explain the requirements of the programs for which the borrower is eligible;

    d.    Explain program documentation requirements;

    e.    Provide basic information about the status of borrower's account, including pending loan modification applications, other loss mitigation alternatives, and foreclosure activity;

    f.    Notify borrower of missing documents and provide an address or electronic means for submission of documents by borrower in order to complete the loan modification application;

    g.    Communicate Servicer's decision regarding loan modification applications and other loss mitigation alternatives to borrower in writing;

    h.    Assist the borrower in pursuing alternative non-foreclosure options upon denial of a loan modification;

    i.    If a loan modification is approved, call borrower to explain the program;

    j.    Provide information regarding credit counseling where necessary;

    k.    Help to clear for borrower any internal processing requirements; and

    l.    Have access to individuals with the ability to stop foreclosure proceedings when necessary to comply with the MHA Program or this Agreement.

5.    The SPOC shall remain assigned to borrower's account and available to borrower until such time as Servicer determines in good faith that all loss mitigation options have been exhausted, borrower's account becomes current or, in the case of a borrower in bankruptcy, the borrower has exhausted all loss mitigation options for which the borrower is potentially eligible and has applied.

6.  Servicer shall ensure that a SPOC can refer and transfer a borrower to an appropriate supervisor upon request of the borrower.

7.  Servicer shall ensure that relevant records relating to borrower's account are promptly available to the borrower's SPOC, so that the SPOC can timely, adequately and accurately inform the borrower of the current status of loss mitigation, loan modification, and foreclosure activities.

8.  Servicer shall designate one or more management level employees to be the primary contact for the Attorneys General, state financial regulators, the Executive Office of U.S. Trustee, each regional office of the U.S. Trustee, and federal regulators for communication regarding complaints and inquiries from individual borrowers who are in default and/or have applied for loan modifications.  Servicer shall provide a written acknowledgment to all such inquiries within 10 business days.  Servicer shall provide a substantive written response to all such inquiries within 30 days.  Servicer shall provide relevant loan information to borrower and to Attorneys General, state financial regulators, federal regulators, the Executive Office of the U.S. Trustee, and each U.S. Trustee upon written request and if properly authorized.  A written complaint filed by a borrower and forwarded by a state attorney general or financial regulatory agency to Servicer shall be deemed to have proper authorization.

9.  Servicer shall establish and make available to Chapter 13 trustees a toll-free number staffed by persons trained in bankruptcy to respond to inquiries from Chapter 13 trustees.

D.  Loss Mitigation Communications with Borrowers.

1.  Servicer shall commence outreach efforts to communicate loss mitigation options for first lien mortgage loans to all potentially eligible delinquent borrowers (other than those in bankruptcy) beginning on timelines that are in accordance with HAMP borrower solicitation guidelines set forth in the MHA Handbook version 3.2, Chapter II, Section 2.2, regardless of whether the borrower is eligible for a HAMP modification.  Servicer shall provide borrowers with notices that include contact information for national or state foreclosure assistance hotlines and state housing counseling resources, as appropriate.  The use by Servicer of nothing more than prerecorded automatic messages in loss mitigation communications with borrowers shall not be sufficient in those instances in which it fails to result in contact between the borrower and one of Servicer's loss mitigation specialists. Servicer shall conduct affirmative outreach efforts to inform delinquent second lien borrowers (other than those in bankruptcy)

A-23

about the availability of payment reduction options. The foregoing notwithstanding. Servicer shall have no obligation to solicit borrowers who are in bankruptcy.

2.   Servicer shall disclose and provide accurate information to borrowers relating to the qualification process and eligibility factors for loss mitigation programs.

3.   Servicer shall communicate. at the written request of the borrower. with the borrower's authorized representatives. including housing counselors. Servicer shall communicate with representatives from state attorneys general and financial regulatory agencies acting upon a written complaint filed by the borrower and forwarded by the state attorney general or financial regulatory agency to Servicer. When responding to the borrower regarding such complaint. Servicer shall include the applicable state attorney general on all correspondence with the borrower regarding such complaint.

4.   Servicer shall cease all collection efforts while the borrower (i) is making timely payments under a trial loan modification or (ii) has submitted a complete loan modification application. and a modification decision is pending. Notwithstanding the above. Servicer reserves the right to contact a borrower to gather required loss mitigation documentation or to assist a borrower with performance under a trial loan modification plan.

5.   Servicer shall consider partnering with third parties. including national chain retailers. and shall consider the use of select bank branches affiliated with Servicer. to set up programs to allow borrowers to copy. fax. scan. transmit by overnight delivery. or mail or email documents to Servicer free of charge.

6.   Within five business days after referral to foreclosure, the Servicer (including any attorney (or trustee) conducting foreclosure proceedings at the direction of the Servicer) shall send a written communication ("Post Referral to Foreclosure Solicitation Letter") to the borrower that includes clear language that:

   a.   The Servicer may have sent to the borrower one or more borrower solicitation communications:

   b.   The borrower can still be evaluated for alternatives to foreclosure even if he or she had previously shown no interest:

   c.   The borrower should contact the Servicer to obtain a loss mitigation application package:

   d.   The borrower must submit a loan modification application

EXHIBIT A
PAGE 56 OF 76

to the Servicer to request consideration for available foreclosure prevention alternatives:

    e.    Provides the Servicer's contact information for submitting a complete loan modification application. including the Servicer's toll-free number; and

    f.    Unless the form of letter is otherwise specified by investor directive or state law or the borrower is not eligible for an appeal under paragraph IV.G.3.a. states that if the borrower is contemplating or has pending an appeal of an earlier denial of a loan modification application, that he or she may submit a loan modification application in lieu of his or her appeal within 30 days after the Post Referral to Foreclosure Solicitation Letter.

E.    Development of Loan Portals.

    1.    Servicer shall develop or contract with a third-party vendor to develop an online portal linked to Servicer's primary servicing system where borrowers can check. at no cost, the status of their first lien loan modifications.

    2.    Servicer shall design portals that may. among other things:

        a.    Enable borrowers to submit documents electronically:

        b.    Provide an electronic receipt for any documents submitted;

        c.    Provide information and eligibility factors for proprietary loan modification and other loss mitigation programs; and

        d.    Permit Servicer to communicate with borrowers to satisfy any written communications required to be provided by Servicer. if borrowers submit documents electronically.

    3.    Servicer shall participate in the development and implementation of a neutral. nationwide loan portal system linked to Servicer's primary servicing system. such as Hope LoanPort to enhance communications with housing counselors. including using the technology used for the Borrower Portal. and containing similar features to the Borrower Portal.

    4.    Servicer shall update the status of each pending loan modification on these portals at least every 10 business days and ensure that each portal is updated on such a schedule as to maintain consistency.

F.    Loan Modification Timelines.

    1.    Servicer shall provide written acknowledgement of the receipt of documentation submitted by the borrower in connection with a first lien loan modification application within 3 business days. In

**EXHIBIT A
PAGE 57 OF 76**

its initial acknowledgment. Servicer shall briefly describe the loan modification process and identify deadlines and expiration dates for submitted documents.

2.    Servicer shall notify borrower of any known deficiency in borrower's initial submission of information, no later than 5 business days after receipt, including any missing information or documentation required for the loan modification to be considered complete.

3.    Subject to section IV.B, Servicer shall afford borrower 30 days from the date of Servicer's notification of any missing information or documentation to supplement borrower's submission of information prior to making a determination on whether or not to grant an initial loan modification.

4.    Servicer shall review the complete first lien loan modification application submitted by borrower and shall determine the disposition of borrower's trial or preliminary loan modification request no later than 30 days after receipt of the complete loan modification application, absent compelling circumstances beyond Servicer's control.

5.    Servicer shall implement processes to ensure that second lien loan modification requests are evaluated on a timely basis. When a borrower qualifies for a second lien loan modification after a first lien loan modification in accordance with Section 2.c.i of the General Framework for Consumer Relief Provisions, the Servicer of the second lien loan shall (absent compelling circumstances beyond Servicer's control) send loan modification documents to borrower no later than 45 days after the Servicer receives official notification of the successful completion of the related first lien loan modification and the essential terms.

6.    For all proprietary first lien loan modification programs, Servicer shall allow properly submitted borrower financials to be used for 90 days from the date the documents are received, unless Servicer learns that there has been a material change in circumstances or unless investor requirements mandate a shorter time frame.

7.    Servicer shall notify borrowers of the final denial of any first lien loan modification request within 10 business days of the denial decision. The notification shall be in the form of the non-approval notice required in paragraph IV.G.1 below.

G.    Independent Evaluation of First Lien Loan Modification Denials.

1.    Except when evaluated as provided in paragraphs IV.B.8 or IV.B.9, Servicer's initial denial of an eligible borrower's request for first lien loan modification following the submission of a

complete loan modification application shall be subject to an independent evaluation. Such evaluation shall be performed by an independent entity or a different employee who has not been involved with the particular loan modification.

2.   Denial Notice.

   a.   When a first lien loan modification is denied after independent review, Servicer shall send a written non-approval notice to the borrower identifying the reasons for denial and the factual information considered. The notice shall inform the borrower that he or she has 30 days from the date of the denial letter declination to provide evidence that the eligibility determination was in error.

   b.   If the first lien modification is denied because disallowed by investor, Servicer shall disclose in the written non-approval notice the name of the investor and summarize the reasons for investor denial.

   c.   For those cases where a first lien loan modification denial is the result of an NPV calculation, Servicer shall provide in the written non-approval notice the monthly gross income and property value used in the calculation.

3.   Appeal Process.

   a.   After the automatic review in paragraph IV.G.1 has been completed and Servicer has issued the written non-approval notice, in the circumstances described in the first sentences of paragraphs IV.B.3, IV.B.5 or IV.B.7,except when otherwise required by federal or state law or investor directives, borrowers shall have 30 days to request an appeal and obtain an independent review of the first lien loan modification denial in accordance with the terms of this Agreement. Servicer shall ensure that the borrower has 30 days from the date of the written non-approval notice to provide information as to why Servicer's determination of eligibility for a loan modification was in error, unless the reason for non-approval is (1) ineligible mortgage, (2) ineligible property, (3) offer not accepted by borrower or request withdrawn, or (4) the loan was previously modified.

   b.   For those cases in which the first lien loan modification denial is the result of an NPV calculation, if a borrower disagrees with the property value used by Servicer in the NPV test, the borrower can request that a full appraisal be conducted of the property by an independent licensed appraiser (at borrower expense) consistent with HAMP

EXHIBIT A
PAGE 59 OF 76

directive 10-15. Servicer shall comply with the process set forth in HAMP directive 10-15, including using such value in the NPV calculation.

c. Servicer shall review the information submitted by borrower and use its best efforts to communicate the disposition of borrower's appeal to borrower no later than 30 days after receipt of the information.

d. If Servicer denies borrower's appeal, Servicer's appeal denial letter shall include a description of other available loss mitigation, including short sales and deeds in lieu of foreclosure.

H. General Loss Mitigation Requirements.

1. Servicer shall maintain adequate staffing and systems for tracking borrower documents and information that are relevant to foreclosure, loss mitigation, and other Servicer operations. Servicer shall make periodic assessments to ensure that its staffing and systems are adequate.

2. Servicer shall maintain adequate staffing and caseload limits for SPOCs and employees responsible for handling foreclosure, loss mitigation and related communications with borrowers and housing counselors. Servicer shall make periodic assessments to ensure that its staffing and systems are adequate.

3. Servicer shall establish reasonable minimum experience, educational and training requirements for loss mitigation staff.

4. Servicer shall document electronically key actions taken on a foreclosure, loan modification, bankruptcy, or other servicing file, including communications with the borrower.

5. Servicer shall not adopt compensation arrangements for its employees that encourage foreclosure over loss mitigation alternatives.

6. Servicer shall not make inaccurate payment delinquency reports to credit reporting agencies when the borrower is making timely reduced payments pursuant to a trial or other loan modification agreement. Servicer shall provide the borrower, prior to entering into a trial loan modification, with clear and conspicuous written information that adverse credit reporting consequences may result from the borrower making reduced payments during the trial period.

7. Where Servicer grants a loan modification, Servicer shall provide borrower with a copy of the fully executed loan modification agreement within 45 days of receipt of the executed copy from the

borrower. If the modification is not in writing, Servicer shall provide the borrower with a written summary of its terms, as promptly as possible, within 45 days of the approval of the modification.

8. Servicer shall not instruct, advise or recommend that borrowers go into default in order to qualify for loss mitigation relief.

9. Servicer shall not discourage borrowers from working or communicating with legitimate non-profit housing counseling services.

10. Servicer shall not, in the ordinary course, require a borrower to waive or release claims and defenses as a condition of approval for a loan modification program or other loss mitigation relief. However, nothing herein shall preclude Servicer from requiring a waiver or release of claims and defenses with respect to a loan modification offered in connection with the resolution of a contested claim, when the borrower would not otherwise be qualified for the loan modification under existing Servicer programs.

11. Servicer shall not charge borrower an application fee in connection with a request for a loan modification. Servicer shall provide borrower with a pre-paid overnight envelope or pre-paid address label for return of a loan modification application.

12. Notwithstanding any other provision of this Agreement, and to minimize the risk of borrowers submitting multiple loss mitigation requests for the purpose of delay, Servicer shall not be obligated to evaluate requests for loss mitigation options from (a) borrowers who have already been evaluated or afforded a fair opportunity to be evaluated consistent with the requirements of HAMP or proprietary modification programs, or (b) borrowers who were evaluated after the date of implementation of this Agreement, consistent with this Agreement, unless there has been a material change in the borrower's financial circumstances that is documented by borrower and submitted to Servicer.

I. Proprietary First Lien Loan Modifications.

1. Servicer shall make publicly available information on its qualification processes, all required documentation and information necessary for a complete first lien loan modification application, and key eligibility factors for all proprietary loan modifications.

2. Servicer shall design proprietary first lien loan modification programs that are intended to produce sustainable modifications according to investor guidelines and previous results. Servicer

A-29

shall design these programs with the intent of providing affordable payments for borrowers needing longer term or permanent assistance.

3.   Servicer shall track outcomes and maintain records regarding characteristics and performance of proprietary first lien loan modifications. Servicer shall provide a description of modification waterfalls, eligibility criteria, and modification terms, on a publicly-available website.

4.   Servicer shall not charge any application or processing fees for proprietary first lien loan modifications.

J.   Proprietary Second Lien Loan Modifications.

1.   Servicer shall make publicly available information on its qualification processes, all required documentation and information necessary for a complete second lien modification application.

2.   Servicer shall design second lien modification programs with the intent of providing affordable payments for borrowers needing longer term or permanent assistance.

3.   Servicer shall not charge any application or processing fees for second lien modifications.

4.   When an eligible borrower with a second lien submits all required information for a second lien loan modification and the modification request is denied, Servicer shall promptly send a written non-approval notice to the borrower.

K.   Short Sales.

1.   Servicer shall make publicly available information on general requirements for the short sale process.

2.   Servicer shall consider appropriate monetary incentives to underwater borrowers to facilitate short sale options.

3.   Servicer shall develop a cooperative short sale process which allows the borrower the opportunity to engage with Servicer to pursue a short sale evaluation prior to putting home on the market.

4.   Servicer shall send written confirmation of the borrower's first request for a short sale to the borrower or his or her agent within 10 business days of receipt of the request and proper written authorization from the borrower allowing Servicer to communicate with the borrower's agent. The confirmation shall include basic information about the short sale process and Servicer's requirements, and will state clearly and conspicuously that the

A-30

Servicer may demand a deficiency payment if such deficiency claim is permitted by applicable law.

5.  Servicer shall send borrower at borrower's address of record or to borrower's agent timely written notice of any missing required documents for consideration of short sale within 30 days of receiving borrower's request for a short sale.

6.  Servicer shall review the short sale request submitted by borrower and communicate the disposition of borrower's request no later than 30 days after receipt of all required information and third-party consents.

7.  If the short sale request is accepted. Servicer shall contemporaneously notify the borrower whether Servicer or investor will demand a deficiency payment or related cash contribution and the approximate amount of that deficiency, if such deficiency obligation is permitted by applicable law. If the short sale request is denied. Servicer shall provide reasons for the denial in the written notice. If Servicer waives a deficiency claim, it shall not sell or transfer such claim to a third-party debt collector or debt buyer for collection.

L.   Loss Mitigation During Bankruptcy.

1.  Servicer may not deny any loss mitigation option to eligible borrowers on the basis that the borrower is a debtor in bankruptcy so long as borrower and any trustee cooperates in obtaining any appropriate approvals or consents.

2.  Servicer shall, to the extent reasonable. extend trial period loan modification plans as necessary to accommodate delays in obtaining bankruptcy court approvals or receiving full remittance of debtor's trial period payments that have been made to a chapter 13 trustee. In the event of a trial period extension, the debtor must make a trial period payment for each month of the trial period. including any extension month.

3.  When the debtor is in compliance with a trial period or permanent loan modification plan. Servicer will not object to confirmation of the debtor's chapter 13 plan. move to dismiss the pending bankruptcy case. or file a MRS solely on the basis that the debtor paid only the amounts due under the trial period or permanent loan modification plan. as opposed to the non-modified mortgage payments.

M.   Transfer of Servicing of Loans Pending for Permanent Loan Modification.

1.  Ordinary Transfer of Servicing from Servicer to Successor Servicer or Subservicer.

a.  At time of transfer or sale. Servicer shall inform successor servicer (including a subservicer) whether a loan modification is pending.

b.  Any contract for the transfer or sale of servicing rights shall obligate the successor servicer to accept and continue processing pending loan modification requests.

c.  Any contract for the transfer or sale of servicing rights shall obligate the successor servicer to honor trial and permanent loan modification agreements entered into by prior servicer.

d.  Any contract for transfer or sale of servicing rights shall designate that borrowers are third party beneficiaries under paragraphs IV.M.1.b and IV.M.1.c. above.

2.  Transfer of Servicing to Servicer.  When Servicer acquires servicing rights from another servicer. Servicer shall ensure that it will accept and continue to process pending loan modification requests from the prior servicer. and that it will honor trial and permanent loan modification agreements entered into by the prior servicer.

## V.  PROTECTIONS FOR MILITARY PERSONNEL.

A.  Servicer shall comply with all applicable provisions of the Servicemembers Civil Relief Act (SCRA). 50 U.S.C. Appx. § 501 *et seq.*, and any applicable state law offering protections to servicemembers. and shall engage an independent consultant whose duties shall include a review of (a) all foreclosures in which an SCRA-eligible servicemember is known to have been an obligor or mortgagor. and (b) a sample of foreclosure actions (which sample will be appropriately enlarged to the extent Servicer identifies material exceptions). from January 1, 2009 to December 31. 2010 to determine whether the foreclosures were in compliance with the SCRA.  Servicer shall remediate all monetary damages in compliance with the banking regulator Consent Orders.

B.  When a borrower states that he or she is or was within the preceding 9 months (or the then applicable statutory period under the SCRA) in active military service or has received and is subject to military orders requiring him or her to commence active military service. Lender shall determine whether the borrower may be eligible for the protections of the SCRA or for the protections of the provisions of paragraph V.F. If Servicer determines the borrower is so eligible. Servicer shall. until Servicer determines that such customer is no longer protected by the SCRA.

1.  if such borrower is not entitled to a SPOC. route such customers to employees who have been specially trained about the protections of the SCRA to respond to such borrower's questions, or

A-32

    2.    if such borrower is entitled to a SPOC. designate as a SPOC for such borrower a person who has been specially trained about the protections of the SCRA (Servicemember SPOC).

C.    Servicer shall. in addition to any other reviews it may perform to assess eligibility under the SCRA. (i) before referring a loan for foreclosure, (ii) within seven days before a foreclosure sale, and (iii) the later of (A) promptly after a foreclosure sale and (B) within three days before the regularly scheduled end of any redemption period. determine whether the secured property is owned by a servicemember covered under SCRA by searching the Defense Manpower Data Center (DMDC) for evidence of SCRA eligibility by either (a) last name and social security number. or (b) last name and date of birth.

D.    When a servicemember provides written notice requesting protection under the SCRA relating to interest rate relief. but does not provide the documentation required by Section 207(b)(1) of the SCRA (50 USC Appx. § 527(b)(1)). Servicer shall accept. in lieu of the documentation required by Section 207(b)(1) of the SCRA. a letter on official letterhead from the servicemember's commanding officer including a contact telephone number for confirmation:

    1.    Addressed in such a way as to signify that the commanding officer recognizes that the letter will be relied on by creditors of the servicemember (a statement that the letter is intended to be relied upon by the Servicemember's creditors would satisfy this requirement):

    2.    Setting forth the full name (including middle initial. if any). Social Security number and date of birth of the servicemember:

    3.    Setting forth the home address of the servicemember: and

    4.    Setting forth the date of the military orders marking the beginning of the period of military service of the servicemember and, as may be applicable. that the military service of the servicemember is continuing or the date on which the military service of the servicemember ended.

E.    Servicer shall notify customers who are 45 days delinquent that, if they are a servicemember. (a) they may be entitled to certain protections under the SCRA regarding the servicemember's interest rate and the risk of foreclosure. and (b) counseling for covered servicemembers is available at agencies such as Military OneSource. Armed Forces Legal Assistance. and a HUD-certified housing counselor. Such notice shall include a toll-free number that servicemembers may call to be connected to a person who has been specially trained about the protections of the SCRA to respond to such borrower's questions. Such telephone number shall either connect directly to such a person or afford a caller the ability to identify

A-33

him- or herself as an eligible servicemember and be routed to such persons. Servicers hereby confirm that they intend to take reasonable steps to ensure the dissemination of such toll-free number to customers who may be eligible servicemembers.

F.   Irrespective of whether a mortgage obligation was originated before or during the period of a servicemember's military service. if, based on the determination described in the last sentence and subject to Applicable Requirements. a servicemember's military orders (or any letter complying with paragraph V.D). together with any other documentation satisfactory to the Servicer. reflects that the servicemember is (a) eligible for Hostile Fire/Imminent Danger Pay and (b) serving at a location (i) more than 750 miles from the location of the secured property or (ii) outside of the United States. then to the extent consistent with Applicable Requirements. the Servicer shall not sell. foreclose, or seize a property for a breach of an obligation on real property owned by a servicemember that is secured by mortgage. deed of trust. or other security in the nature of a mortgage, during. or within 9 months after. the period in which the servicemember is eligible for Hostile Fire/Imminent Danger Pay. unless either (i) Servicer has obtained a court order granted before such sale. foreclosure. or seizure with a return made and approved by the court. or (ii) if made pursuant to an agreement as provided in section 107 of the SCRA (50 U.S.C. Appx. § 517). Unless a servicemember's eligibility for the protection under this paragraph can be fully determined by a proper search of the DMDC website. Servicer shall only be obligated under this provision if it is able to determine. based on a servicemember's military orders (or any letter complying with paragraph V.D). together with any other documentation provided by or on behalf of the servicemember that is satisfactory to the Servicer. that the servicemember is (a) eligible for Hostile Fire/Imminent Danger Pay and (b) serving at a location (i) more than 750 miles from the location of the secured property or (ii) outside of the United States.

G.   Servicer shall not require a servicemember to be delinquent to qualify for a short sale. loan modification. or other loss mitigation relief if the servicemember is suffering financial hardship and is otherwise eligible for such loss mitigation. Subject to Applicable Requirements, for purposes of assessing financial hardship in relation to (i) a short sale or deed in lieu transaction. Servicer will take into account whether the servicemember is. as a result of a permanent change of station order. required to relocate even if such servicemember's income has not been decreased. so long as the servicemember does not have sufficient liquid assets to make his or her monthly mortgage payments. or (ii) a loan modification. Servicer will take into account whether the servicemember is. as a result of his or her under military orders required to relocate to a new duty station at least seventy five mile from his or her residence/secured property or to reside at a location other than the residence/secured property. and accordingly is

A-34

unable personally to occupy the residence and (a) the residence will continue to be occupied by his or her dependents, or (b) the residence is the only residential property owned by the servicemember.

H.    Servicer shall not make inaccurate reports to credit reporting agencies when a servicemember, who has not defaulted before relocating under military orders to a new duty station, obtains a short sale, loan modification, or other loss mitigation relief.

## VI.    RESTRICTIONS ON SERVICING FEES.

A.    General Requirements.

   1.    All default, foreclosure and bankruptcy-related service fees, including third-party fees, collected from the borrower by Servicer shall be bona fide, reasonable in amount, and disclosed in detail to the borrower as provided in paragraphs I.B.10 and VI.B.1.

B.    Specific Fee Provisions.

   1.    Schedule of Fees. Servicer shall maintain and keep current a schedule of common non-state specific fees or ranges of fees that may be charged to borrowers by or on behalf of Servicer. Servicer shall make this schedule available on its website and to the borrower or borrower's authorized representative upon request. The schedule shall identify each fee, provide a plain language explanation of the fee, and state the maximum amount of the fee or how the fee is calculated or determined.

   2.    Servicer may collect a default-related fee only if the fee is for reasonable and appropriate services actually rendered and one of the following conditions is met:

       a.    the fee is expressly or generally authorized by the loan instruments and not prohibited by law or this Agreement;

       b.    the fee is permitted by law and not prohibited by the loan instruments or this Agreement; or

       c.    the fee is not prohibited by law, this Agreement or the loan instruments and is a reasonable fee for a specific service requested by the borrower that is collected only after clear and conspicuous disclosure of the fee is made available to the borrower.

   3.    Attorneys' Fees. In addition to the limitations in paragraph VI.B.2 above, attorneys' fees charged in connection with a foreclosure action or bankruptcy proceeding shall only be for work actually performed and shall not exceed reasonable and customary fees for such work. In the event a foreclosure action is terminated prior to the final judgment and/or sale for a loss mitigation option, a

reinstatement. or payment in full. the borrower shall be liable only for reasonable and customary fees for work actually performed.

4.    Late Fees.

     a.    Servicer shall not collect any late fee or delinquency charge when the only delinquency is attributable to late fees or delinquency charges assessed on an earlier payment. and the payment is otherwise a full payment for the applicable period and is paid on or before its due date or within any applicable grace period.

     b.    Servicer shall not collect late fees (i) based on an amount greater than the past due amount: (ii) collected from the escrow account or from escrow surplus without the approval of the borrower: or (iii) deducted from any regular payment.

     c.    Servicer shall not collect any late fees for periods during which (i) a complete loan modification application is under consideration: (ii) the borrower is making timely trial modification payments: or (iii) a short sale offer is being evaluated by Servicer.

C.    Third-Party Fees.

1.    Servicer shall not impose unnecessary or duplicative property inspection. property preservation or valuation fees on the borrower. including. but not limited to. the following:

     a.    No property preservation fees shall be imposed on eligible borrowers who have a pending application with Servicer for loss mitigation relief or are performing under a loss mitigation program. unless Servicer has a reasonable basis to believe that property preservation is necessary for the maintenance of the property. such as when the property is vacant or listed on a violation notice from a local jurisdiction:

     b.    No property inspection fee shall be imposed on a borrower any more frequently than the timeframes allowed under GSE or HUD guidelines unless Servicer has identified specific circumstances supporting the need for further property inspections: and

     c.    Servicer shall be limited to imposing property valuation fees (e.g.. BPO) to once every 12 months. unless other valuations are requested by the borrower to facilitate a short sale or to support a loan modification as outlined in paragraph IV.G.3.a. or required as part of the default or

A-36

foreclosure valuation process.

2.    Default, foreclosure and bankruptcy-related services performed by third parties shall be at reasonable market value.

3.    Servicer shall not collect any fee for default, foreclosure or bankruptcy-related services by an affiliate unless the amount of the fee does not exceed the lesser of (a) any fee limitation or allowable amount for the service under applicable state law, and (b) the market rate for the service.  To determine the market rate, Servicer shall obtain annual market reviews of its affiliates' pricing for such default and foreclosure-related services; such market reviews shall be performed by a qualified, objective, independent third-party professional using procedures and standards generally accepted in the industry to yield accurate and reliable results.  The independent third-party professional shall determine in its market survey the price actually charged by third-party affiliates and by independent third party vendors.

4.    Servicer shall be prohibited from collecting any unearned fee, or giving or accepting referral fees in relation to third-party default or foreclosure-related services.

5.    Servicer shall not impose its own mark-ups on Servicer initiated third-party default or foreclosure-related services.

D.    Certain Bankruptcy Related Fees.

1.    Servicer must not collect any attorney's fees or other charges with respect to the preparation or submission of a POC or MRS document that is withdrawn or denied, or any amendment thereto that is required, as a result of a substantial misstatement by Servicer of the amount due.

2.    Servicer shall not collect late fees due to delays in receiving full remittance of debtor's payments, including trial period or permanent modification payments as well as post-petition conduit payments in accordance with 11 U.S.C. § 1322(b)(5), that debtor has timely (as defined by the underlying Chapter 13 plan) made to a chapter 13 trustee.

VII.  **FORCE-PLACED INSURANCE.**

A.    General Requirements for Force-Placed Insurance.

1.    Servicer shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance.  For escrowed accounts, Servicer shall continue to advance payments for the homeowner's existing policy, unless the borrower or insurance company cancels the existing policy.

A-37

EXHIBIT A
PAGE 69 OF 76

For purposes of this section VII. the term "force-placed insurance" means hazard insurance coverage obtained by Servicer when the borrower has failed to maintain or renew hazard or wind insurance on such property as required of the borrower under the terms of the mortgage.

2.   Servicer shall not be construed as having a reasonable basis for obtaining force-placed insurance unless the requirements of this section VII have been met.

3.   Servicer shall not impose any charge on any borrower for force-placed insurance with respect to any property securing a federally related mortgage unless:

    a.   Servicer has sent. by first-class mail. a written notice to the borrower containing:

        i.   A reminder of the borrower's obligation to maintain hazard insurance on the property securing the federally related mortgage;

        ii.   A statement that Servicer does not have evidence of insurance coverage of such property;

        iii.   A clear and conspicuous statement of the procedures by which the borrower may demonstrate that the borrower already has insurance coverage;

        iv.   A statement that Servicer may obtain such coverage at the borrower's expense if the borrower does not provide such demonstration of the borrower's existing coverage in a timely manner;

        v.   A statement that the cost of such coverage may be significantly higher than the cost of the homeowner's current coverage;

        vi.   For first lien loans on Servicer's primary servicing system. a statement that. if the borrower desires to maintain his or her voluntary policy. Servicer will offer an escrow account and advance the premium due on the voluntary policy if the borrower: (a) accepts the offer of the escrow account; (b) provides a copy of the invoice from the voluntary carrier; (c) agrees in writing to reimburse the escrow advances through regular escrow payments; (d) agrees to escrow to both repay the advanced premium and to pay for the future premiums necessary to maintain any required insurance policy; and (e) agrees Servicer shall manage the escrow account in

A-38

accordance with the loan documents and with state and federal law; and

vii.    A statement, in the case of single interest coverage, that the coverage may only protect the mortgage holder's interest and not the homeowner's interest.

b.    Servicer has sent, by first-class mail, a second written notice, at least 30 days after the mailing of the notice under paragraph VII.A.3.a that contains all the information described in each clause of such paragraph.

c.    Servicer has not received from the borrower written confirmation of hazard insurance coverage for the property securing the mortgage by the end of the 15-day period beginning on the date the notice under paragraph VII.A.3.b was sent by Servicer.

4.    Servicer shall accept any reasonable form of written confirmation from a borrower or the borrower's insurance agent of existing insurance coverage, which shall include the existing insurance policy number along with the identity of, and contact information for, the insurance company or agent.

5.    Servicer shall not place hazard or wind insurance on a mortgaged property, or require a borrower to obtain or maintain such insurance, in excess of the greater of replacement value, last-known amount of coverage or the outstanding loan balance, unless required by Applicable Requirements, or requested by borrower in writing.

6.    Within 15 days of the receipt by Servicer of evidence of a borrower's existing insurance coverage, Servicer shall:

a.    Terminate the force-placed insurance; and

b.    Refund to the consumer all force-placed insurance premiums paid by the borrower during any period during which the borrower's insurance coverage and the force placed insurance coverage were each in effect, and any related fees charged to the consumer's account with respect to the force-placed insurance during such period.

7.    Servicer shall make reasonable efforts to work with the borrower to continue or reestablish the existing homeowner's policy if there is a lapse in payment and the borrower's payments are escrowed.

8.    Any force-placed insurance policy must be purchased for a commercially reasonable price.

9. No provision of this section VII shall be construed as prohibiting Servicer from providing simultaneous or concurrent notice of a lack of flood insurance pursuant to section 102(e) of the Flood Disaster Protection Act of 1973.

## VIII. GENERAL SERVICER DUTIES AND PROHIBITIONS.

A. Measures to Deter Community Blight.

1. Servicer shall develop and implement policies and procedures to ensure that REO properties do not become blighted.

2. Servicer shall develop and implement policies and procedures to enhance participation and coordination with state and local land bank programs. neighborhood stabilization programs. nonprofit redevelopment programs. and other anti-blight programs. including those that facilitate discount sale or donation of low-value REO properties so that they can be demolished or salvaged for productive use.

3. As indicated in I.A.18. Servicer shall (a) inform borrower that if the borrower continues to occupy the property, he or she has responsibility to maintain the property. and an obligation to continue to pay taxes owed. until a sale or other title transfer action occurs: and (b) request that if the borrower wishes to abandon the property. he or she contact Servicer to discuss alternatives to foreclosure under which borrower can surrender the property to Servicer in exchange for compensation.

4. When the Servicer makes a determination not to pursue foreclosure action on a property with respect to a first lien mortgage loan. Servicer shall:

a. Notify the borrower of Servicer's decision to release the lien and not pursue foreclosure. and inform borrower about his or her right to occupy the property until a sale or other title transfer action occurs: and

b. Notify local authorities. such as tax authorities. courts. or code enforcement departments. when Servicer decides to release the lien and not pursue foreclosure.

B. Tenants' Rights.

1. Servicer shall comply with all applicable state and federal laws governing the rights of tenants living in foreclosed residential properties.

2. Servicer shall develop and implement written policies and procedures to ensure compliance with such laws.

EXHIBIT A
PAGE 72 OF 76

IX.   GENERAL PROVISIONS, DEFINITIONS, AND IMPLEMENTATION.

    A.    Applicable Requirements.

        1.    The servicing standards and any modifications or other actions taken in accordance with the servicing standards are expressly subject to, and shall be interpreted in accordance with, (a) applicable federal, state and local laws, rules and regulations, including, but not limited to, any requirements of the federal banking regulators, (b) the terms of the applicable mortgage loan documents, (c) Section 201 of the Helping Families Save Their Homes Act of 2009, and (d) the terms and provisions of the Servicer Participation Agreement with the Department of Treasury, any servicing agreement, subservicing agreement under which Servicer services for others, special servicing agreement, mortgage or bond insurance policy or related agreement or requirements to which Servicer is a party and by which it or its servicing is bound pertaining to the servicing or ownership of the mortgage loans, including without limitation the requirements, binding directions, or investor guidelines of the applicable investor (such as Fannie Mae or Freddie Mac), mortgage or bond insurer, or credit enhancer (collectively, the "Applicable Requirements").

        2.    In the event of a conflict between the requirements of the Agreement and the Applicable Requirements with respect to any provision of this Agreement such that the Servicer cannot comply without violating Applicable Requirements or being subject to adverse action, including fines and penalties, Servicer shall document such conflicts and notify the Monitor and the Monitoring Committee that it intends to comply with the Applicable Requirements to the extent necessary to eliminate the conflict.  Any associated Metric provided for in the Enforcement Terms will be adjusted accordingly.

    B.    Definitions.

        1.    In each instance in this Agreement in which Servicer is required to ensure adherence to, or undertake to perform certain obligations, it is intended to mean that Servicer shall: (a) authorize and adopt such actions on behalf of Servicer as may be necessary for Servicer to perform such obligations and undertakings; (b) follow up on any material non-compliance with such actions in a timely and appropriate manner; and (c) require corrective action be taken in a timely manner of any material non-compliance with such obligations.

        2.    References to Servicer shall mean Bank of America, N.A. and shall include Servicer's successors and assignees in the event of a sale of all or substantially all of the assets of Servicer or of

EXHIBIT A
PAGE 73 OF 76

Servicer's division(s) or major business unit(s) that are engaged as a primary business in customer-facing servicing of residential mortgages on owner-occupied properties. The provisions of this Agreement shall not apply to those divisions or major business units of Servicer that are not engaged as a primary business in customer-facing servicing of residential mortgages on owner-occupied one-to-four family properties on its own behalf or on behalf of investors.

David W. Dow, Esq. (SBN 007377)
THE LAW OFFICES OF DAVID W. DOW
3104 E. Camelback Road #281
Phoenix, AZ 85016
Phone: 602-550-2951
Fax: 480-945-0553
ddowlaw1@gmail.com
*Attorney for Plaintiff*

**COPY**

JUN 24 2013

MICHAEL K. JEANES, CLERK
M. GARCIA
DEPUTY CLERK

## SUPERIOR COURT OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

JAMES KRAMER,

               Plaintiff,

v.

OCWEN LOAN SERVICING, LLC;
UNKNOWN THIRD PARTY
DEFENDANTS 1-100; UNKNOWN OTHER
DEFENDANTS 1-100; LITTON LOAN
SERVICING, LLC.

               Defendants.

Case No.   CV2013-008640

**CERTIFICATE OF ARBITRATION**

     The undersigned asserts that the Complaint served by Plaintiffs seek relief that **DOES** exceed the limits set by the Rules for Compulsory Arbitration, Arizona Rules of Civil Procedure, and therefore this matter **is not** subject to compulsory arbitration pursuant to Rule 72, Arizona Rules of Civil Procedure.

1

**EXHIBIT A**
**PAGE 75 OF 76**

1

2 **RESPECTFULLY SUBMITTED** this 24th day of June, 2013.

3

4

5 By: _____

6 David W. Dow

7 3104 E. Camelback Rd. #281
Phoenix, Arizona 85016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

Ariz. Corp. Comm. -- Corporations Division                    Page 1 of 2

Case 2:13-cv-01415-DGC   Document 1   Filed 07/15/13   Page 81 of 84

Arizona Corporation Commission
07/15/2013                State of Arizona Public Access System                9:58 AM

## Jump To...

Scanned Documents    Microfilm

| Corporate Inquiry | |
|---|---|
| **File Number: R-1030453-3** | Check Corporate Status |
| **Corp. Name: OCWEN LOAN SERVICING, LLC** | |

### Domestic Address

| |
|---|
| % CORPORATION SERVICE COMPANY |
| 2338 W ROYAL PALM RD STE-J |
| PHOENIX,  AZ  85021 |

### Foreign Address

| |
|---|
| 1675 PALM BEACH LAKES BLVD |
| WEST PALM BEACH,  FL  33401 |

### Statutory Agent Information

| |
|---|
| **Agent Name:**  CORPORATION SERVICE COMPANY |
| |
| **Agent Mailing/Physical Address:** |
| 2338 W ROYAL PALM RD STE-J |
| PHOENIX,  AZ  85021 |
| |
| **Agent Status:** APPOINTED 05/15/2002 |
| **Agent Last Updated:** 05/21/2002 |

### Additional Corporate Information

| | |
|---|---|
| **Corporation Type:** FOREIGN L.L.C. | **Business Type:** |
| **Incorporation Date:**  05/15/2002 | **Corporate Life Period:** |
| **Domicile:**  DELAWARE | **County:** MARICOPA |
| **Approval Date:**  05/15/2002 | **Original Publish Date:** |

### Scanned Documents

EXHIBIT B
PAGE 1 OF 2

Ariz. Corp. Comm. -- Corporations Division                    Page 2 of 2

Case 2:13-cv-01415-DGC   Document 1   Filed 07/15/13   Page 82 of 84

**(Click on gray button to view document - will open in a new window)**

| Document Number | Description | Date Received |
|---|---|---|
| 00779605 | MULTIPLE CHANGES | 08/25/2003 |

Back To Top

## Microfilm

| Location | Date Received | Description |
|---|---|---|
| 11526006022 | 05/15/2002 | APPLICATION FOR REGISTRATION |
| 31747001557 | 08/25/2003 | MULTIPLE CHANGES |

Back To Top

- **Corporate Name Search Instructions**
- **General Web Site Usage Instructions**
- **STARPAS Main Menu**
- **A.C.C. Corporations Division Main Page**
- **Arizona Corporation Commission Home Page**

EXHIBIT B
PAGE 2 OF 2



## Registered Name
**Information Search**
Generated by TnT Names Search Version 3.11

**Instructions**

## General Information

| | |
|---|---|
| **File ID** | 3005701 |
| **Description** | Foreign Limited Partnership |
| **Status** | Active |
| **Name** | LITTON LOAN SERVICING LP |
| **Address 1** | 4828 LOOP CENTRAL DR STE 600 |
| **City** | HOUSTON |
| **State** | TX |
| **ZIP** | 77081- |

## Agent/Owner Information

| Agent ID | Type | Fullname | Address | City | State | ZIP | Phone |
|---|---|---|---|---|---|---|---|
| 12641 | Service of Process | CORPORATION SERVICE COMPANY | 818 EAST OSBORN ROAD | PHOENIX | AZ | 85014- | 800-927-9800 |
| 340160 | Service of Process | LITTON GP LLC | 5373 WEST ALABAM SUITE 600 | HOUSTON | TX | 77056- | |
| 465443 | Service of Process | CORPORATION SERVICE COMPANY | 2338 W. ROYAL PALM ROAD, SUITE J | PHOENIX | AZ | 85021- | |

## Registration Information

| Received | Amended | Assigned | Expiration | Cancelled | Revoked |
|---|---|---|---|---|---|
| 8/8/2000 | 9/29/2003 | | | | |

## Correspondence History

| Description | Date | Printed | Filmed | Loc. No. | Page No. | Pages |
|---|---|---|---|---|---|---|
| Amendment | 9/29/2003 | | | | | 1 |
| Amendment | 1/30/2002 | | | | | 1 |

EXHIBIT C
PAGE 1 OF 2

| Amendment | 6/27/2001 | | | | | | 1 |
| Application | 8/8/2000 | 1/5/2001 | | | | | |

*©Copyright 2000 by Arizona Secretary of State - ALL RIGHTS RESERVED*

Please email your comments or questions regarding this system to trades@azsos.gov. We appreciate any feedback.

Disclaimer

EXHIBIT C
PAGE 2 OF 2